# CHARLESTON.

J. E. McDonald et als. v. County Court of Logan County.

Submitted October 30, 1923.   Decided November 6, 1923.

1.   Counties—*County Court May Dispose of Land on Which Old Jail Erected.*

   A county court, where it has obtained a new jail site and erected a jail thereon, may sell or otherwise dispose of the land on which the old jail was erected, as to the court may seem proper.   (p. 778).

2.   Same—*County Court May Exchange Old Jail Site for Land Adjoining New Site to be Used for Building Purposes or for Conservation of Light and Air.*

   Such county court may exchange the old site for land adjoining the new site and to be used for building purposes or for the conservation of light and air, and access to the new building.   (p. 778).

3.   Same—*Fact That Old Jail Site More Valuable Than New Site for Which Exchanged Held Not Conclusive of Fraud, Unless Disparity of Values Shocks Conscience.*

   Where the market or commercial value of the old site thus exchanged is much more than the commercial value of the land acquired for jail purposes, that fact alone is not conclusive of fraud in the transaction, unless the disparity of values is so great as to shock the conscience of the chancellor, and the circumstances warrant the conclusion of *mala fides* on the part of the members of the court.   (p. 779).

4.   Same—*Exchange of Old Jail Site of Greater Value for New Jail Site Approved.*

   A case where the county court in the exercise of its discretion was justified in exchanging land of greater value for land of lesser value necessary for use for jail purposes.   (p. 779).

5.   Fraud—*Must be Clearly Proved.*

   Fraud is never presumed, and where it is alleged the facts sustaining it must be clearly proved.   (p. 782).

Appeal from Circuit Court, Logan County.

Action by J. E. McDonald and others against the County Court of Logan County. From a decree denying relief, and dismissing the bill, plaintiffs appeal.

*Affirmed.*

*Minter & McNemar,* for appellants.
*Chafin & Estep* and *Lilly & Shrewsbury,* for appellee.

Lively, Judge:

The decree complained of by this appeal, entered April 29, 1922, denied plaintiffs relief and dismissed their bill.

The object of the bill is to cancel a deed from the county court to Logan Hardware Company, dated June 14, 1920, which conveyed a lot in the city of Logan fronting 37½ feet on Hudgins street and running back about 80 feet where the lot is 32 feet wide, being a part of "old jail lot"; to cancel and set aside a deed from the Logan Hardware Company to the county court conveying a strip of land fronting about 12 feet on Reservoir street and running back about 72 feet where it is about 6 feet wide and where it abuts upon the old jail lot; and to vacate a proposed street which had been opened and paved between Hudgins street and Reservoir street having a width of 15 feet running through the old jail lot a distance of about 80 feet and thence through the property of the Logan Hardware Company to Reservoir street a distance of about 72 feet, and the lines of which new street, if extended across Reservoir street, would correspond with the lines of a road or street running therefrom up the hill to residence property, and especially to the S. B. Browning property now owned by W. F. Farley, president of the county court.

The suit was instituted by J. E. McDonald and others, citizens and taxpayers of Logan county, on behalf of themselves and all other taxpayers similarly situated. It appears that Naaman Jackson and perhaps two others named as plaintiffs withdrew from prosecution of the suit, leaving J. E. McDonald the principal complainant. The ground for the relief sought is that the transaction, by which the properties were exchanged between the Hardware Company and the county court and the street opened and paved, was a fraudulent transaction; that the fraud is apparent because the value of the property conveyed by the county is perhaps three or four times more valuable in a commercial sense than that received by the county from the Hardware Company; that

the opening and paving of the street was unnecessary and improper; that A. H. Land, a member of the county court at the time the transfer was made, was also a stockholder in the Hardware Company; that W. F. Farley, the president of the county court, was the owner of the S. B. Browning property on the hill; that the opening of the street from Reservoir street to Hudgins street gave a better method of ingress and egress to the Browning property, increasing its value, and that the transfer was made on the part of Farley for the purpose of enhancing the value of his recently purchased property, to the consequent detriment of the taxpayers of the county.

At this point it may be well to state the conditions which led up to this alleged fraudulent transfer of the old jail lot. It seems that the old jail, on what is known as the old jail lot in this proceeding, became totally inadequate for the needs of the county and was unsafe and unsanitary. The late Judge Wilkinson, then judge of the circuit court, had entered an order requiring the county court to construct a suitable sanitary jail. After some delay the legislature gave authority to the county court to lay a special levy to construct a jail in accordance with the order of the circuit court. The levy was laid and a site was procured from Naaman Jackson in 1919, being a lot adjoining the old jail lot facing on Hudgins street and running back through the square to Reservoir street, thus adjoining the old jail lot a distance of about 80 feet. The Logan Hardware Company owned the land back of the old jail lot, and this land of the Hardware Company adjoined the new jail lot purchased from Naaman Jackson a distance of about 72 feet, that is, it adjoined the Naaman Jackson lot 72 feet measuring from Reservoir street back to the old jail lot. After the purchase of the new site the court proceeded to make plans for the erection of the new jail. Farley was president of the court and Bruce McDonald and A. H. Land commissioners. Plans were submitted, inspected and considered by the court for the new jail, which contemplated the erection of the jail in the shape of an "L" covering the new site and a portion of the old site, the jailer's residence being located on the old site and the jail proper

and the entrance thereto facing on the Naaman Jackson lot and running back towards Reservoir street. Pending the consideration of these plans, the proposition of the transfer of the respective properties and the opening of a street was considered by the court, but was, rejected, Farley, Bruce McDonald and the prosecuting attorney, who was present at the various conferences, being of the opinion that the difference in the respective commercial values of the lots proposed to be traded, together with the then tentative plans for building the jail, would not justify the court in making the trade. At that time the plans for the construction of the jail had not been drafted or adopted. Finally, W. D. Smith, a competent and well-known architect, of Huntington, West Virginia, was employed by the court to draw up the plans and specifications. He and perhaps Land and McDonald went onto the ground and took the measurements and looked over the situation. Smith was averse to the adoption of the ''L''-shaped plan theretofore and then under consideration by the court, and proposed to the members that the entire building, including the jailer's residence, should be constructed on the new lot entirely, making the residence part on the front facing Hudgins street and the jail part extending back to Reservoir street, and demonstrated to the court that this new plan proposed by him would save $20,000 in the erection of the building and lessen the up-keep after it was constructed; and he demonstrated to the court that it would be necessary for light and air and ingress and egress to the. back portions of the jail that more land should be acquired, at least 15 feet more, a distance of about 72 feet at the rear portion of the proposed jail, which land was owned as before stated, by the Hardware Company. The architect took up the matter of obtaining this additional land with England, the president of the Hardware Company, who, it seems, had been favorable to the proposition of a trade, and who had a year or so before brought it to the attention of the county court through Judge WILKINSON, and which had been rejected by the county court for the reasons above stated. By acquiring the property adjoining the rear portion of the jail for a sufficient distance to allow a passway, the architect

was enabled to leave a space of about 8 feet between the jail wall on the opposite side of the lot and the line of that lot, thus making the building stand by itself with space all around it for air, light and observation. He submitted to the county court the plans by which a similar building in Pike county, Kentucky, had been constructed by him and which gave entire satisfaction. About this time or possibly before these new plans were submitted by the architect, thus bringing into consideration the old proposition of transfer which had been theretofore rejected by Farley and McDonald, McDonald resigned as a member of the court. His resignation took place at the January term, 1920, and J. G. McNeely was appointed in his stead. It appears that the court concluded to adopt the plans and specifications made by Architect Smith who urged them to procure the necessary additional land as soon as possible that the work might proceed. The prosecuting attorney was present when the new plans were adopted. Robert Bland, then prosecuting attorney and now judge of the circuit court, in his testimony tersely and clearly states the reasons and considerations which induced the court to make the transfer now charged to have been fraudulent. After stating the reasons why he and the members of the court had been averse to the proposition of exchange up to the time of the plans and requirements submitted by Smith, he states:

> "There were two plans for the construction of the jail offered and presented to the court, one presented the building as it now is, in a rectangle, with the jail and jailer's residence all in one building, and the other presented the building in an ell shape with the jailer's residence on the old jail lot. After discussing the plans it was decided by the county court and I agreed with them in that, that we could get a better building by building the house as it now is than to follow the other plan, and we were informed by the architect that it would cost something like $20,000 less, so the court decided to build the building as is now stands, and to get room around the building for ingress and egress, as well as to afford opportunity for the jailer and officials and other persons to see what was going on around the building, and thereby prevent escapes and jail breaking, and to get light and air around the

building, the exchange was made. It was not thought advisable to leave private owned property adjoining the jail as it was proposed for fear of the light and air, ingress and egress, being obstructed by buildings. So for this reason the court decided and I concurred in the opinion that the exchange would be made, and it was made without reference to what we might term commercial value of the two pieces of property, the county wishing to obtain a suitable jail lot to be held, as it will no doubt be perpetual for that purpose, the values per front foot or back foot, or any other foot was not considered.''

It does not appear definitely at what time before the deeds were exchanged this conclusion of the county court was reached. Smith says it was possibly two or three weeks before, and that he urged speedy action in obtaining the additional land so that he could complete his plans and proceed with the building. The court met on the 7th day of June, 1920, and the record shows that Farley and Land were present; the sitting of the court was adjourned from day to day until the 14th of that month when the order was entered directing the transfers to be made and the deeds executed. The point is made that Land, who was a stockholder in the Hardware Company, participated in the making of this order as shown by the record; but it appears from Land's testimony and that of McNeely and others that Land was not present except on the first day of the term and that he afterwards was in constant attendance upon his duties as fuel administrator of that district in the city of Huntington. As a fact McNeely was present when the order was entered and the deed executed, and made no objection thereto, he being under the impression that the trade had been agreed upon by the court before he became a member. However, he says the trade was a good one from the standpoint of the county court and that he approved it; and it appears also that the new commissioner who was elected in 1920, P. M. Toney, also approved the transfer and was perfectly satisfied with the trade which had been made before he became a member. A formal order was entered on the 14th day of June, 1921, by the court, then composed of Farley, McNeely and Toney, ap-

proving and ratifying the former action of the court in making the trade. In consideration of the transfer of the old jail lot to the Hardware Company the latter transferred to the county court the small portion heretofore designated as fronting 12 and a fraction feet on Reservoir street, running back adjoining the new site for a distance of about 72 feet and agreed to open up the street through the block 15 feet wide running through its property and the old jail site from Hudgins street back to Reservoir street and pave the same. The cost of paving was something in the neighborhood of $1,200; and it appears also that it was necessary for the Hardware Company to remove a building which occupied a portion of its lot taken by this street which was worth possibly $1200 or $1500.

The answer of the county court sets out the above facts and denies that there was any fraud in the transaction, and asserts that while the commercial values of the properties transferred were not equal yet on account of light and air, ingress and egress and other advantages obtained by having the jail built without possibility of buildings adjoining it or near to it, the transfer was proper and justified. The evidence of defendants, especially that of Smith and Judge BLAND, who are in no way interested, sustains this allegation in the answer. The county court had power to sell or trade the old lot as it deemed proper. Sec. 14, chap. 39, Code. It may be conceded that the trade was advantageous to the Hardware Company in many ways and that the commercial value of the land received by it was possibly two or three times greater than that which was transferred by it to the county court. This fact is insisted upon by plaintiffs to show the bad faith of the transaction and its fraudulent nature. We think it was peculiarly within the judgment and discretion of the county court to make this bargain without consideration alone of the mere commercial values of the properties traded. *Keatley* v. *County Ct.*, 70 W. Va. 267. The disparity is not such as to shock the conscience of the chancellor. We think the allegation of fraud based upon the disparity of commercial values is not sustained. However, plaintiffs assert that it was not necessary for the court to dispose

of its valuable property in that way; that the land necessary for the new and present plan of the jail could have been condemned at a much less sum. The price at which the necessary land could have been obtained by condemnation is very uncertain, and besides the time lost and costs expended in such a proceeding would be an important element to consider. The court had been advised by eminent and proficient counsel not to undertake condemnation proceedings. A jail was urgently needed, an order to build it had been entered by the circuit court and mandamus proceedings threatened, the money for the building had been provided by special levy, the architect was insisting upon speedy action and if the final plans and the beginning of the construction of the building had been delayed by condemnation proceedings, which often continue for a long time, the county court could take all these matters into consideration and act within its discretion. When would there have been an end to the condemnation suit? Such cases often reach this court where vigorously contested. What expense would have been incurred? What compensation would commissioners or a jury award? Would such a proceeding pave the street in front of the jail? On the other hand, the court might have obtained by condemnation the additional land at much less price than that given in the transfer. We think these were considerations which would justify the county court in closing the deal and proceeding with its work. Its course has been approved by the present county court, and it is apparent that it has met with general approval.

The other grounds of fraud, namely, the participation of Land as a member of the county court and as a stockholder in the Hardware Company; the fact that Farley, the president of the county court, purchased the Browning property and was actuated by personal motives, will now be considered. It is clear that while Land was favorable to the transfers as a general proposition, he was not unduly insistent thereupon, and had very little to do with the details. He says he did not know what the details of the trade were, had never discussed them and never knew that the deal was consum-

mated until after it was closed.  He was a member of the Draft Board from its organization until January, 1918, and from that time was district representative of the Fuel Administrator, and duties of these positions required all of his time and attention and he was stationed at Huntington and Charleston in the discharge thereof.   He had expressed a desire to resign as a member of the court, but was prevailed upon to defer his resignation until after the coming general election.   It is apparent that he had little to do with the trade, and we think it is clearly shown that he had no ulterior motives in approving it, and was not present when the county court agreed to the exchange.   While he owned 70 or 75 shares of stock in the Hardware Company he had nothing to do with its management or destinies.

It is asserted that Farley, the president of the court, had purchased the Browning property, and it was by reason of his personal interest in this property that he experienced a change of mind on the trade from what he had theretofore had; that after he purchased the Browning property he reversed his opinion, and that this was such a fraud that would vitiate the transaction.   Dr. Farley and Judge Bland, who acted as his attorney, testified that the county court had concluded to build the jail according to the plans presented by Smith, architect, and to obtain the necessary adjoining land, before Farley purchased the Browning property.   While it appears that the deed from Browning to Farley was made on the 12th of May, 1920, and that the deed from the county court to the Hardware Company is dated June 14, 1920, yet it appears that the county court had concluded to adopt the Smith plans and specifications and procure the additional land   before   Farley   purchased the Browning property.   Moreover, it is not clear that the opening of the street by the jail from Reservoir street to Hudgins street added to the value of the Browning property.   Farley says he has offered the Browning property for sale at the same price he paid for it and has been unable to sell it.   He swears that he never had the faintest vision of purchasing the Browning property at the time the deal with

the Hardware Company was agreed upon by the county court, and that he has no interest whatever in the street opened by the jail any further than procuring light and ventilation for the jail; and that for any other purpose it could be closed so far as he is concerned. While it appears that the outlet from the Browning property over Reservoir street, which is not paved, is not as desirable as the new street opened up by the trade (although it passes by the jail) we do not think the record shows convincingly that Dr. Farley had any motive in making the deal other than what he considered to be the best interests of the county. The increase in the value of the Browning property is negligible and is of little weight, even if it had been owned by Farley at the time the exchange of properties was agreed upon.

The record discloses that the present value of the old jail site is from ten to fourteen thousand dollars; and that the present value of the strip of land traded therefor is negligible as compared with the value of the old site. At the time the proposition was under consideration and surveys were being made the plaintiff McDonald offered to buy the old jail lot at $5,000. The value of the property at that time was much less than at the time the depositions were taken. The evidence is to the effect that property fronting on Hudgins street was worth two or three times as much per foot above the property abutting on Reservoir street in June, 1920. But we do not think the disparity in the commercial or market values of the property is conclusive of fraud on the part of the county court under the facts hereinbefore detailed and well established.

It may we well to observe that the trade was consummated on the 14th of June, 1920; that the jail has been constructed with reference to the paved street and land in front of it acquired by the transfer, and that the entrances for the admission of male and female prisoners into their various separate compartments, together with the opening for storing coal in the basement, fronts on the side of the jail faced by the new street, the old jail site and the property acquired from the

Hardware Company; that the street has been paved at a cost of about $1200; and that this suit was instituted at June rules, 1921, about one year after the alleged fraudulent transactions had been consummated and the deeds put on record. To grant the relief prayed for now, would seriously affect the public interests.

> "It is a rule of universal recognition that, except in particular cases, he who alleges fraud must clearly and distinctly prove it, whether by circumstantial or direct evidence. The law does not presume fraud, but on the contrary the presumption is always in favor of innocence and not of guilt, and unless the allegations of fraud are proven, relief will be denied, although it may appear that the defendant has not been perfectly clear in his dealings." 6 Encyc. Dig. Va. & W. Va. Rep. p. 502, and cases cited.

We have concluded that the record does not disclose that the transfers sought to be set aside were induced by fraudulent motives; that the allegations of fraud have not been sustained, and the decree will be affirmed?

*Affirmed.*