# CHARLESTON

## PRIDDY v. COAL CO.

### Submitted March 18, 1908.    Decided March 31, 1908.

1.  MASTER AND SERVANT—*Contributory Negligence.*
    When an employe willfully encounters danger known to him, or patent and open to be seen and known, he cannot recover damages from his employer for injury therefrom.   (p. 248.)

2.  JURY TRIAL—*Verdict Set Aside on Plain Preponderance of Evidence.*
    This Court will set aside the verdict of a jury, although the evidence is conflicting, where, upon the whole evidence, it appears to be plainly wrong, and clearly against the weight of the testimony; and when, to permit such verdict to stand, would be a plain injustice to the defendant.   (p. 249.)

Error to Circuit Court, Putnam County.

Action by Columbus Priddy against the Black Betsy Coal & Mining Company.   Judgment for plaintiff, and defendant brings error.

*Reversed.*

JAMES H. NASH and BOWYER & GREEN, for plaintiff in error.

W. G. BARNHART, CHAS. E. HOGG, and GUNN, ALEXANDER & BARNHART, for defendant in error.

BRANNON, JUDGE:

At the Black Betsey Coal & Mining Company's coal mining plant from the mouth of the bank to the dump or tipple, where the coal cars filled in the bank are dumped

into railroad cars, runs a railroad track a distance of forty-three feet over a trestle a considerable height above the ground. Three motors are used in the bank to bring the coal out of the bank to its mouth. There the coal cars are cut loose from the motors and pushers take the cars one by one over the railroad track, and they are taken possession of by other men at the dump, and their contents dumped into railroad cars. Then these pushers go back to the mouth of the mine for another coal car. Thus these pushers bring out the coal cars one by one, very rapidly, bringing out, some of the witnesses say, one a minute. Each motor brings to the bank mouth twenty-five or thirty coal cars. Columbus Priddy and Joe Harmon were pushers. Upon a trestle on which the coal company's railroad rested was a platform composed of plank between the ties on which the pushers walked in pushing the cars. The coal company was having an improvement made by putting a shelter over this platform for the protection of the men in bad weather. Two carpenters were doing this work, and it became necessary in doing it to take up planks here and there to fix supports for the roof. They had been working two or three days taking up a number of planks during their work, and had replaced them. On the day when the accident involved in this case occurred the carpenters took up one plank. This plank was of the width of one foot, leaving a hole of that width in the platform where Columbus Priddy and Joe Harmon were pushing coal cars. One car was discovered to have gotten loose at the mouth of the coal bank and would move toward the dump down grade, and Priddy and Harmon took hold of it to sprag it and take it on to the dump, one of them on each side, and in passing over the hole Priddy, as he claims, fell into it and his right arm in the fall went across the rail of the railroad and was run over by the coal car and was injured so that amputation was necessary. Priddy in an action recovered against the coal company a verdict of $10,000. Upon a motion for a new trial the circuit court compelled the plaintiff to make a *remittitur* of half the verdict and rendered judgment for $5,000, and the coal company brings the case here.

The only question discussed orally or in brief of counsel of the coal company are on the motion for a

new trial and the action of the court in allowing the *re-mittitur*.

Some doubt might be raised whether Priddy received his injury from that hole in the platform or fell before his feet reached it. He had his left hand on the coal car and had the sprag bar in his right hand seeking to insert it into the wheel to arrest the car. He is indefinite in evidence. In one place he says he fell into the hole. In another, when asked if just one foot went into the hole, his answer was "My best *recollection* is that both went through." He did not go down through the trestle. Nobody says he did. Nobody says his legs were in the hole save himself. Persons were close, and none say he was taken from the hole. At another point of his evidence when asked, "How did you fall into that hole?" he answered, "My hand and arm went into the hole. I fell with this right arm across the rail." Now, if his left hand and arm went into that hole and his right across the rail, it would seem that his feet stumbled before reaching the hole. On this basis counsel insists that he fell before he reached the hole. But as Priddy swore that his legs went into that hole, and his is the only evidence as to that, and the jury have so found, we cannot find with the defense as to this.

The great question in this case is, Did Priddy have notice or knowledge of the existence of this hole in the platform? The carpenters and numerous other witnesses say that the plank was taken up from seven to eight o'clock in the morning. There is absolutely no question about that fact under the evidence. Priddy and other hands at the opening of labor on the day of the accident were down under the dump on the track of the railroad gathering some coal that was wasted on the ground. After spending a half hour or so at this work they went up the steps at the dump onto the platform. All say this. Priddy and Harmon both say that they went up the steps onto the platform on their way to the mouth of the coal bank to push coal cars to the dump. Everybody says that in so doing they would pass over this hole necessarily. But this is not by any means all. The accident occurred not earlier than eleven o'clock, Priddy says about dinner. Before it

occurred car after car of coal had been pushed over the hole by Priddy and Harmon from the mouth of the coal bank to the dump, the hole gaping open before their eyes in the broad day light. The superintendent of the mine says that the register shows that 140 coal cars had gone to the dump that day before the accident occurred, and he says that Priddy made two hundred trips in going to the tipple and back to the coal bank for cars. Hutton, one of the dump men, says that at least one hundred cars had been pushed by Priddy and Harmon over this hole. Whittington, another fellow-workman with Priddy, says that one hundred cars had been pushed by Priddy and Harmon before the accident, and that they had made two hundred trips over this hole. Harmon, a pusher working with Priddy, says they pushed from fifty to one hundred cars over the hole before the accident. Nobody disputes this. Nobody disputes that for hours before the accident Priddy pushed cars over this hole, great in number. Some of the evidence being that it was as rapidly as a car a minute. The distance was so short. We do absolutely know under these facts beyond question that dozens and dozens of trips were thus made by Priddy. He does not deny it. He says that he was pushing cars all that morning, and there was no other way than to pass them over that hole. He is evasive when asked how many cars had been pushed before the accident, and does not name the number, but admits that he was working there hours in pushing cars. Thus it would violate the great volume of evidence not to say that many, many trips had been made over this hole by Priddy that day before the accident. When that hole, extended clear across the track and to the end of the ties, was yawning open before him; when we know beyond cavil or question that Priddy had been pushing cars for hours, and that the hole was there from between seven and eight o'clock, no man can question that the hole was crossed by Priddy dozens and dozens of times at least. No witness puts it less than from one hundred to two hundred times. I say one hundred simply because one witness. Harmon, says that from fifty to one hundred cars passed. Other witnesses say from one hundred to one hundred and forty.

But this is not all. These carpenters had been working two or three days, taking up a plank now and then. Priddy himself, as a witness, says that he knew that the carpenters had been working, and saw them working that morning. He says he did not see them move the plank. When asked "How did you know that they was moving it?" he answered, "I heard them say so." His wife says that she heard him say that he did not know of this plank being out, but knew of others. Thus he knew of the work going on, and he knew that they were taking out planks. Can a court say, under these circumstances, that he was not warned of danger, with no duty on him to be watchful of his safety? Priddy denies that he knew the hole was there. How could he help knowing it under the facts stated above?

But this is by no means all. Worrel, the mine superintendent, says that he had given notice to the hands on the first day the carpenters had taken the plank out. "I had given them notice particularly, and had cautioned them several times. That morning that Mr. Priddy had the accident I told them for all of them to be careful and watch the hole. I told it to the whole tipple crew. They was all together." He was asked, "Who were they?" His answer was: "Whittington and Hutton and Mr. Priddy and Mr. Harmon. And I cautioned them, I don't know, I reckon a dozen times at least during this work before the accident." Now, unless we brand this man as a perjurer only because he was an employee of the coal company we must say that Priddy was warned that very morning. There were only four of the crew. We must not think that there was a great body of men. There were only two dumpers and two pushers. Is it not probable that Worrel, the superintendent, would, not only from motives of humanity residing in almost every man's breast, but also to save his company from loss, give the warning which he says he gave? But Worrel is not the only witness to prove warning. Farror, one of the two carpenters, a witness for the plaintiff, says: "We notified them when we went to work there, that they would have to be careful about this hole, told them that we was going to take out some boards. I remember distinctly of notifying them several times about the hole." He was asked, "Who were they?" and answered "Mr. Hutton, Mr. Whittington, Mr.

Priddy and Mr. Harmon." He then when asked whether he meant the plaintiff said, "Yes, Sir, Mr. Lum Priddy, the plaintiff." Fowler, the other carpenter, when asked whether Priddy knew of the hole, said, "The boys was all cautioned. I do not know whether Mr. Priddy was there at the time. They was cautioned to be careful, that there was danger in those holes." He also said, "I heard Mr. Farror speak at different times about being careful." He said he could not name any certain ones of the hands hearing the caution, but said, "Just all working around there." He said that likely Priddy heard it. This impression on his mind must have sprung from having given the caution when Priddy was there. Hutton, a fellow-workman, said that the carpenters had notified "us" that morning "and told us to be careful." He said that Priddy was supposed to be there. Anderson, another fellow-workman, says the carpenters told him that morning that they were going to take that plank out, and that he told the men of it. Harmon, who was working with Priddy as a pusher, says that Farror took the plank out and "told us fellows to be careful, that we would fall through it." When asked, "What fellows?" he answered, "To me and Mr. Priddy and Mr. Hutton and Mr. Whittington." He further said that Priddy was standing right by his side when Farror told them that he had taken the plank out of the platform. On cross-examination he said Priddy was warned that morning. Wilby says that he notified all the men to be careful and not get into the holes some days before the accident. He says Priddy was on the platform when he talked about this. Whittington says all were standing by when Fowler told them to be careful until they could get the plank back, and that all of the crew was standing by. He thinks Priddy was there or close by. He distinctly says that he saw Farror and Tyree take up this particular plank, that Joe Harmon was standing there, and that he thinks the plaintiff was there also. These are the only witnesses as to warning, except Priddy. There is no other showing as to it. There is no contradiction of this evidence of these witnesses, except Priddy himself.

Let us add to all that has been said above the fact that this unfortunate man told Wilby that he did not blame

anybody with the accident but himself; and that he told
Anderson that he knew the hole was open, and that it was
his own neglect; and told Kischner that he knew the hole
was there, and it was his own neglect. This was on the occa-
sion of the amputation of his arm. Priddy told Bowling,
his physician, that he knew the hole was there and that his
accident was due to his own carelessness. He had several
talks with him, and Priddy described how the accident hap-
pened. Priddy denies these statements. But their prob-
able truthfulness is corroborated by the facts above given,
namely, that Priddy passed again and again over the hole
and could not help seeing it, and also from those warn-
ings. Priddy is moved by self interest and strong call for
support; but we cannot let him overrule four witnesses on
this one point. A jury cannot fly in the face of witness
after witness at the bidding of an unfortunate man moved
by strongest motives of self interest. Priddy's wife denies
the statement of one of these witnesses, but she too is swayed
by that weakness of human nature, for which the common
law that reigned in England century after century and
also where we live until 1869, absolutely excluding Priddy
and his wife from the witness stand. They are now compe-
tent witnesses, but their self interest still affects their
credit. We must therefore say, if human evidence can rea-
sonably establish anything, that Priddy not only could and
should have known of this hole in the platform, but in
fact did know of it, and therefore we must apply the law
in the cases cited by counsel, *Seldomridge* v. *C. & O.
Ry. Co.*, 46 W. Va. 568, holding that, " When an employee
willfully encounters danger known to him, or patent and
open to be seen and known, he cannot recover damages
from his employer for injury therefrom." And also the
case of *Giebell* v. *The Collins Co.*, 54 W. Va. 519, holding
that, " Where the servant has equal knowledge with the
master of the danger incident to the work, he takes the
risk upon himself, if he goes on with it." There is also
cited a case of *Choctaw G. R. Co.* v. *McDay*, 191 U. S.
64, holding the same principle. See *Knight* v. *Cooper*, 36
W. Va. 232.

Though a master is bound to give his servant a safe

place to work, still if the servant know, or should know, of a patent danger he cannot recover, because the law is that where both the master and the servant are negligent there can be no recovery. *Overby* v. *C. & O. Ry. Co.*, 37 W.Va. 524. But what negligence is chargeable to the company? It had right to make the roof it was making.

The coal company had rules printed and posted at the platform, telling its employees not to work when there was danger, and giving them leave to refuse to do so, and that it would not be a ground of discharge.

We reconize—no one more than I—that verdicts of juries on mere evidence should be seldom overruled, especially where evidence is conflicting; but our law allows cases to be brought to this Court upon the overruling of a motion for a new trial, and the Code, chapter 131, section 9, requires us to consider such evidence when certified. Though evidence be conflictive, many cases sustain the duty of this Court to grant new trials in proper cases, though caution should be observed. 10 Encyclopedic W.Va. & Va. Digest 459, In *Chapman* v. *Liverpool Salt Co.*, 57 W. Va. 395, we hold that: "This Court will set aside the verdict of a jury, although the evidence is conflicting where, upon the whole evidence, it appears to be plainly wrong, and clearly against the weight of the testimony; and when, to permit such verdict to stand, would be a plain injustice to the defendant." That principle applies in this case very forcibly. This verdict disregards the great weight, preponderance and strength of the evidence, so that we can hardly say that there is any appreciable conflict of evidence. The jury cannot be permitted to disregard the great weight and preponderance of evidence as was done in this case. The jury seems to have been governed by mere sympathy. I would rather give the verdict that explanation than to attribute it to bias against a corporation. This is somewhat supported by the fact that the verdict is large; the exact amount given is the maximum by our statute where death ensues from wrongful act. The circuit judge so regarded the verdict. We, too, have sympathy for the unfortunate plaintiff; but we cannot let sympathy drown the evidence and justice of the case.

It becomes unnecessary to discuss the power of the court as to the *remittitur*.

For these reasons we must reverse the judgment, set aside the verdict and award a new trial.

*Reversed.*