T. A. WARD, JR., DBA WARD CONSTRUCTION COMPANY

*v.*

L. L. SMITH, DBA SMITH CONSTRUCTION COMPANY

(No. 10677)

Submitted February 1, 1955. Decided March 28, 1955.

*Ernest E. Winters, Norton & Layne, W. H. Norton,* for plaintiff in error.

*Charles F. Bagley, Jr., Russell L. Daugherty, W. H. Darnall,* for defendant in error.

HAYMOND, JUDGE:

Claiming an unpaid sum of $24,432.41 for crushed stone furnished under a written contract, the plaintiff T. A. Ward, Jr., doing business as Ward Construction Company, instituted this action in assumpsit in the Circuit Court of Cabell County on February 1, 1952, to recover that amount from the defendant L. L. Smith, doing business as Smith Construction Company.

The case was tried upon an amended declaration filed by the plaintiff, which contained common counts and a special count based upon a written contract between the parties, a plea of the general issue and a special plea filed by the defendant, and a general replication by the plaintiff

to the pleas filed by the defendant. By the special plea the defendant tendered and paid into court the sum of $931.36, which was by the defendant alleged to be the only sum to which the plaintiff was entitled for any balance due upon the contract. The tender of that sum, made with the foregoing special plea, was refused by the plaintiff. At the conclusion of the evidence offered by the plaintiff and at the conclusion of all the evidence, the defendant moved the court to strike the evidence introduced in behalf of the plaintiff and to direct a verdict for the defendant. These motions were overruled, and the jury returned a verdict in favor of the plaintiff for $24,432.41, with interest from July 7, 1950.

By order entered January 11, 1954, the circuit court overruled the motion of the defendant to set aside the verdict of the jury and grant him a new trial and entered judgment against the defendant for the amount of the verdict with interest and costs. To that judgment this Court awarded this writ of error upon the petition of the defendant.

Sometime prior to August 16, 1949, the State Road Commission of West Virginia published a notice to contractors that sealed proposals would be received at its office in Charleston until ten o'clock in the morning of that day for several state road projects, among which was one designated as Project No. 5051 for the construction of the Palermo-Spurlockville Road of approximately 25,164 feet, or 4.76 miles, in Lincoln County, West Virginia. The defendant, a general contractor of about thirty years experience, with an office located at Huntington, West Virginia, submitted a proposal to construct the road according to the plans and the specifications of the State Road Commission for the estimated total cost of the entire project of $131,270.55. His bid of that amount was the lowest bid submitted, his proposal was accepted by the commission, and he was awarded the contract.

On August 17, 1949, he entered into a written contract with the State of West Virginia, acting by the State Road Commission, which contained the provisions, among

others, that he should furnish at his cost and expense all necessary materials, labor, tools and appliances to build and complete the road in a good workmanlike and substantial manner; that the work to be done by him under the contract should be performed in accordance with the plans and the specifications of the State Road Commission which were referred to and made a part of the contract; and that the construction work should be commenced within ten days after the date of the award and should be completed in one hundred seventy five days. The proposal of the defendant, which was also a part of the contract, provided for an estimate of 12,000 cubic yards of slag as necessary to complete the surface of the road at the price of four dollars per cubic yard which included the cost of the material and the expense of placing it on the road. The estimate of this amount of material had been previously made by an experienced engineer in the construction division of the State Road Commission. By supplemental contract dated September 22, 1949, because of the scarcity of slag, crusher run stone was substituted for the slag required by the original contract at the same price of four dollars per cubic yard.

The original appropriation of $144,000.00 for the completion of the entire project was ultimately increased to $170,000.00 and the amount of the original bid of the defendant of $131,270.55 was increased by reason of an extension of approximately 500 feet of road construction, additional excavation and other extras required and authorized by the engineers of the commission, to $147,750.13 which was the final total amount paid to the defendant for the completion of the project in its entirety.

On September 23, 1949, the defendant as the party of the first part and the plaintiff as the party of the second part entered into a written contract, constituting a subcontract relating to the crushed stone to be used in the construction of the road, by which the plaintiff agreed to furnish to the defendant all crushed rock or stone required for that purpose. This contract contains these pertinent provisions:

"WHEREAS the party of the first part is the general contractor with the State Road Commission of West Virginia for the construction of a certain traffic-bound road from Spurlockville to Palermo Road in Lincoln County, West Virginia, and

"WHEREAS the party of the second part has agreed to crush and furnish crushed stone on said job according to the specifications of said State Road Commission for the consideration hereinafter mentioned.

"NOW THEREFORE THIS AGREEMENT WITNESS-ETH: That for and in consideration of payments hereinafter mentioned, the said party of the second part does hereby covenant and agree that he will furnish to the said party of the first part, all crushed rock or stone required on said job according to the specifications of the State Road Commission of West Virginia; that the rock or stone will be crushed on the job at such points or places as may be approved by said State Road Commission and run in stock pile or piles; that proper equipment necessary will be furnished by him on the job together with sufficient men to operate the same and that said crushing and piling will be done at such time as may be required by the party of the first part.

"The said party of the first part promises to pay to the said party of the second part the sum of Two Dollars and Seventy Five Cents ($2.75) for each cubic yard of crushed rock furnished to the said party of the first part in accordance with the paragraph immediately preceding hereof, which payment shall be made not later than the 10th day of the month following the month in which said crushed rock was piled."

In the specifications of the State Road Commission relating to construction is this provision: "(a) No base course material shall be placed until the subgrade has been completed and accepted for a distance of at least five-hundred (500) feet in advance of the placing of the base. No base course material shall be laid upon a wet, muddy, frozen or unstable subgrade. Should any subgrade

be dry to the point of being dusty, it shall be moistened by sprinkling as directed by the Engineer." Another provision of the specifications dealing with the method of measurement contains this language: "The quantity of work done under this item shall be measured in cubic yards of material used, measured in vehicles at the point of delivery."

The plaintiff who had been engaged in general excavation and heavy construction work for about six years but had not previously done any work for the State Road Commission or any work in crushing stone became interested in furnishing stone for the project at the instance of a man named Stevens who induced him to purchase a machine which was used to crush the stone. Before entering into the contract with the defendant the plaintiff, accompanied by Stevens and Bradley, the general superintendent of the defendant, visited the project, informed Bradley of the price for which the plaintiff would furnish crushed stone at a stock pile, and consented to the selection by Bradley of the site of the quarry which was located about midway between the ends of the project. The day following this visit the plaintiff, after discussing with the defendant the proposed contract between them, purchased the machine from Stevens and a few days later he and the defendant entered into the written contract of September 23, 1949. During the period November 10, 1949, to July 12, 1950, the plaintiff caused the stone to be quarried, crushed and placed in a stock pile where it was loaded in trucks, furnished by the defendant and driven by his employees, and transported to the various locations on the road for use by the defendant in its construction.

Shortly after the contract of September 23, 1949, was signed, the plaintiff and the defendant, at the project, in the presence of Watts, an inspector for the State Road Commission, agreed that each of the trucks owned and used by the defendant, when loaded above the level of the top of its sides, contained four cubic yards of crushed stone. On a few occasions during the progress of the work the defendant used two or three larger trucks which were

not owned by him and it was agreed that each of these trucks when similarly loaded contained five cubic yards of crushed stone.

During the time the plaintiff furnished the crushed stone the State Road Commission separately assigned to the project two of its employees, Watts and Pyles, as inspectors, and two other employees, Kearney and Rice, as checkers. Shortly after the work began the defendant went to Florida and he was absent from the project while most of the work was performed. He was represented by his general superintendent Bradley who, though absent at times, supervised the work, and by his foreman Hinchman, who was actively in charge and was continuously present while the work was in progress. The defendant also employed nine persons who at different times and in varying number drove the trucks which transported the crushed stone from the stock pile to the locations on the road at which it was used.

The employees of the plaintiff who quarried and crushed the stone began their daily work about seven o'clock, and the truck drivers started to load and haul the crushed stone about eight o'clock, in the morning of each day such work was performed at the project. The inspectors and the checkers who lived in Huntington, usually left at eight o'clock and arrived at the project, forty to forty five miles from Huntington, about nine o'clock each morning.

The defendant adopted the method provided by the contract of September 23, 1949, in measuring the quantity of crushed stone furnished by the plaintiff. Though the plaintiff, who did not visit the project daily but was present a large part of the time, made some check of the quantity delivered during the early stage of the work, he did not continue to do so. He did not make any complete separate account or keep any record of the quantity of crushed stone delivered, and during the progress of the work he did not examine or check the record of the count which he knew was being made and which could have been examined at the office of the defendant in Huntington where it was kept. On some occasions the wife and

the father of the plaintiff were at the project and his wife checked some of the loaded trucks but it does not appear that either of them made any complete check or kept any record of the amount of crushed stone delivered to the trucks. The plaintiff did not employ or station any person at the project to check or count or record for him the quantity of the crushed stone furnished to the defendant and the plaintiff has no record, based on any truck load count, of the amount of crushed stone delivered to the trucks used by the defendant.

In making the count used by the defendant and the State Road Commission the checker or the inspector employed by the commission prepared in duplicate a separate slip or ticket for each truck load of crushed stone which in every instance showed the date, the quantity of crushed stone loaded in the truck, and the initials of the checker or the name of an inspector, and in other instances also showed the trade name of the defendant and the number of the truck. The person who prepared the slip detached it from a small book containing fifty consecutively numbered slips. When the checker prepared the slip he gave the duplicate to the driver of the loaded truck and later the same day delivered the original to the inspector and when the inspector prepared the slip he gave the duplicate to the driver of the loaded truck and retained the original. From the originals the inspector entered the daily totals in a daily diary of the State Road Commission which was later sent to the district office of the commission at Huntington and eventually forwarded to its construction division at Charleston where each original was checked and counted and the daily diary was checked. After the final settlement between the commission and the defendant was concluded and the defendant had been paid in full the originals were destroyed. The driver of each loaded truck each day delivered the duplicates to the foreman of the defendant who sent them to the office of the defendant in Huntington where they were checked and the daily total was entered in a record known as a journal memorandum. Some of the duplicates have been

preserved and they were introduced in evidence by the defendant.

The record prepared by the State Road Commission from the originals shows 12,955 cubic yards as the total quantity of crushed stone delivered by the plaintiff to the defendant and the record prepared by the defendant from the duplicates shows 12,959 cubic yards as the total quantity of crushed stone so delivered or a difference of only four cubic yards. The final settlement between the commission and the defendant was based on the quantity shown by the record kept by the commission and the defendant was paid for 12,955 cubic yards of crushed stone used in the completion of the project.

Though the contract of September 23, 1949, provides that the defendant should pay the plaintiff at the rate of $2.75 for each cubic yard of crushed stone not later than the tenth day of the month following the month in which the stone was piled the defendant paid the plaintiff and he accepted $13,612.50 on December 13, 1949, $7,000.00 on February 2, 1950, $3,000.00 on February 14, 1950, and $10,000.00 on June 12, 1950. These payments aggregate the sum of $33,612.50. These installments did not represent the quantity of crushed stone which had been placed in the stock pile at the time they were paid. Some of them were in excess of the amount due at the time and they constituted payments on the account between the plaintiff and the defendant.

The plaintiff accuses the defendant of fraud in the use of the method provided by the contract for determining the quantity of crushed stone furnished by the plaintiff and insists that there is substantial error in the quantity so determined.

The plaintiff testified that after the contract was signed Bradley, the general superintendent of the defendant, told him that he and the defendant had influence with the State Road Commission; that they could either "make me or break me"; that if the work was not entirely satisfactory to them the plaintiff would never work on another

state road project; that the plaintiff would be required to assent to any change that Bradley decided to make; that Bradley and the defendant used their influence "as a club over my head"; that in January, 1950, the stone in the stock pile was temporarily rejected; that Bradley by telephone told the plaintiff that the inspectors Watts and Pyles were in his office and that they would consent to accept the rejected material if the plaintiff would "consent to shut down until spring"; that he had "no choice about the matter"; that any effort made by him to make a count of the crushed stone and to proceed "would be headed off" and his operation "would be shut down"; that "Any number of days I was shut down in the middle of the job"; that the inspectors were not present at any certain time but would come at any time during the day; that "sometimes they didn't even come"; that quantities of crushed stone were used on the road by the defendant for which no slips were made; that the count made of the crushed stone used by the defendant was incorrect; that an employee of the State Road Commission named Sutphin, who was "over the inspector", was employed by the defendant; that under the conditions which existed it was impossible for him to make any count of the quantity of crushed stone furnished; that if he did he would have been "shut down"; that he was "shut down" at different times but that he was unable to give the exact dates when that occurred; that he could have measured the amount of crushed stone if he had "kept a man out there 24 hours a day to watch them"; that more crushed stone than was required by the specifications had been used by the defendant at various places on the road; and that contrary to the specifications quantities of crushed stone had been placed on the road when it was in a muddy condition with the result that more crushed stone was used than was needed.

The plaintiff also showed by the defendant and Watts, who testified in behalf of the defendant, that the defendant in August, 1949, had loaned Watts $300.00; that the amount of the loan had been increased to $700.00 and remained unpaid; that Watts had received as a gift from

the defendant a turkey and some whiskey; that in December, 1949, Watts had requested the plaintiff to let him have $100.00; and that the plaintiff had refused to grant that request.

Though the plaintiff testified that stone in the stock pile which had been too finely crushed had been rejected, he admitted that it was used after other stone had been mixed with it. With respect to the times his quarry had been "shut down" he admitted that the defendant never stopped him from crushing the stone but stated that the inspectors did so. He also admitted that under the contract he was required to crush and pile the stone at such time as would be required by the defendant.

The plaintiff testified that he was prevented from making any count of the quantity of crushed stone furnished by him but he did not mention any particular instance when he was so prevented or designate the person who prevented him from making such count. He did not indicate any specific occasion when crushed stone was furnished for which no slip was issued or designate any specific error in the count made for the defendant of the crushed stone furnished to him or estimate the amount of crushed stone which he says was placed upon the road when it was in a muddy condition. He also admitted that he did not complain to the defendant during the progress of the work that his operation of the quarry had been "shut down"; that he did not protest the manner in which the count of the crushed stone was made or question the amount of the crushed stone furnished as determined by that method until shortly before the work was completed when he complained to Bradley about the amount of the crushed stone furnished; and that he did not mention the matter to the defendant or to any representative of the State Road Commission until after the project was completed.

To establish the claim of the plaintiff that the defendant owed him the sum of $24,432.41, representing the unpaid balance for 21,538 cubic yards, instead of the truck load count of 12,955 cubic yards, of crushed stone delivered to

the defendant, the plaintiff introduced in evidence, over the objection of the defendant, the testimony of Cornell, a civil engineer of about twenty five years experience in surveying highway construction projects, who determined, by a method different from that provided by the specifications, the amount of crushed stone furnished to the defendant. This witness, from measurements made by him in July, 1950, of the space in and about the quarry from which the solid stone crushed by the plaintiff and delivered to the defendant had been removed, found that the total gross amount of solid stone so removed was 12,725 cubic yards. From this amount he deducted 329 cubic yards of earth overlying the solid stone, 333 cubic yards of stone blasted from the quarry but not used, and 229 cubic yards of unused stone left in the quarry, or a total of 891 cubic yards. He testified that the remaining amount of solid stone of 11,834 cubic yards when crushed contained voids or open spaces between the particles of crushed stone to the extent of forty five per cent; that the mass of solid stone when crushed was increased approximately eighty two per cent; and that the total amount of the solid stone when crushed was 21,538 cubic yards. He based his percentage of voids upon certain handbooks written by engineers who he stated were recognized as authorities in the field of engineering and he adopted the percentage of forty five as an average between the minimum percentage of twenty eight and the maximum percentage of fifty which were considered as standards by the writers of the books he consulted and used in his calculations.

The plaintiff also introduced in evidence, over the objection of the defendant, a certified copy of the record of the United States Weather Bureau of the maximum, minimum, and average temperatures and the precipitation at Huntington, West Virginia, for the months of October, 1949, to June, 1950, for the purpose of showing the muddy condition of the road bed at the project.

The defendant testified as a witness in his own behalf. In his testimony he stated that the plaintiff did not at any time during the progress of the work complain to him

about the method used in counting the loaded trucks or the amount of crushed stone for which he was paid; and that the plaintiff did not make any complaint to the defendant with respect to any money due him until after the project was completed.

The defendant also produced as witnesses in his behalf his general superintendent Bradley, his foreman Hinchman, the two inspectors Watts and Pyles, the two checkers Kearney and Rice, and five of the nine truck drivers employed by him at the project.

Bradley testified concerning the method of determining the amount of crushed stone furnished by the plaintiff. He stated that the amounts shown by the slips were entered of record under his supervision and that all the crushed stone that was used by the defendant was included in the total of 12,955 cubic yards. He denied that he had told the plaintiff, by telephone, that crushed stone in the stock pile would be condemned if the plaintiff did not suspend his work but he admitted that on several occasions, in order to make the stone conform to the specifications, he required the plaintiff to mix some of the stone with larger particles before it was accepted and used. He denied that he had told the plaintiff that he controlled the employees of the State Road Commission or that the plaintiff would be "shut down" if he did not do what Bradley told him to do, or that he prevented the plaintiff at any time from checking the number of truck loads of crushed stone.

Hinchman testified to the method used to determine the amount of crushed stone delivered to the trucks and stated that each truck driver received a slip for each truck load of crushed stone; that the slips were delivered to him each night by each truck driver; that the slips were checked by him; that the count shown by the slips was correct; and that he delivered the slips to the office of the defendant where they were checked. He stated that when any trucks were loaded before the checkers or the inspectors arrived at the project and the load was hauled before a slip was issued to the driver, the drivers reported

the number of loads to the inspectors and received a slip for each load that had been hauled. He also stated that he did not at any time attempt to retard the work of the plaintiff; that he did not hear Bradley tell the plaintiff that "he would be shut down if he didn't do what" Bradley told him to do; that he did not know of any effort by Bradley or any other employee of the defendant to cause the plaintiff to "shut down"; that the plaintiff did not check the truck load count with him; and that the plaintiff at no time complained to him. This witness further testified to the effect that employees of the State Road Commission used about five cubic yards of crushed stone to construct a foundation for a house which had been moved in connection with the project for which no slip was issued.

The inspectors Watts and Pyles testified concerning the method of measuring the quantity of crushed stone furnished by the plaintiff.

Watts stated that a separate slip was issued for every truck load of crushed stone by an inspector or by a checker; that a duplicate was given to each truck driver and the original was retained by the checker and later delivered by him to the inspector; that the originals were checked daily by the inspector and the amount of crushed stone shown by each original was entered in a record prepared by the inspector which, with the originals, was sent to the district office of the State Road Commission at Huntington; that the quantity of crushed stone delivered as shown by the originals and by the record made from them was correct; that slips were issued for all crushed stone delivered; that when the inspectors and the checkers did not arrive at the project until after the drivers of the trucks had hauled some truck loads of crushed stone, which at times occurred, the drivers kept a count of and reported to the checker when he arrived the number of truck loads that had been hauled by them and were issued a slip for each such truck load of crushed stone. He stated that he was not controlled or influenced in the performance of his work by the defendant or Bradley or Hinchman or any other person; that the plaintiff had at times checked

with him the quantity of the crushed stone furnished; and that the records kept by him were available to the plaintiff whenever he desired to see them. He also testified that on one occasion some of the stone at the stock pile was condemned by him at the instance of Sutphin, a representative of the State Road Commission, but that after it was mixed with larger stone it was used on the road.

Pyles, the other inspector, who was employed at the project from the time the work began until it was completed and who succeeded Watts as chief inspector after he left about December 9, 1949, testified that the loaded trucks were correctly counted; that a slip was issued for each truck; that the checkers at the project were at first Kearney and, after he left, Rice; that they issued slips for the loaded trucks; that he and Watts issued some slips; that he received the slips from the checker at the end of each day; that from the slips he entered the daily total in a daily diary which he kept; that the entries and the diary were correct; that the total amount of crushed stone delivered by the plaintiff after the last load was hauled on July 12, 1950, was 12,959 cubic yards; that he checked the amount of crushed stone hauled with Hinchman each day; that the plaintiff occasionally checked the amounts with the witness; that the records kept by him were available to the plaintiff; and that the plaintiff never complained to him about the count made of the loaded trucks or questioned its correctness. He further stated that he never heard Bradley threaten to condemn any crushed stone furnished by the plaintiff and that he did not slow his operation; that the witness made no such threat; and that neither Bradley nor any other employee of the defendant ever attempted to influence the witness in the performance of his work.

Kearney who was the checker at the project until shortly before Christmas in 1949 testified that he was present each day the crushed stone was hauled except one day; that he usually arrived at the project shortly before nine o'clock in the morning; that he issued in duplicate a slip for every truck load of crushed stone and gave the duplicate to the

driver of the truck and the original to the inspector; that the slips were correct; that when truck loads of crushed stone had been hauled before he arrived at the project, which at times occurred, he obtained from the driver of the truck the number of such loads and then issued a duplicate slip for each load. He also stated that the plaintiff checked with him his daily count of the loaded trucks. Rice who succeeded Kearney as a checker on March 27, 1950, gave substantially the same testimony as that given by Kearney concerning the use and the disposition made of the slips issued by him and the manner of ascertaining from the drivers the number of truck loads of crushed stone hauled before he arrived at the project. He stated that the slips issued by him showed the exact cubic yards of crushed stone hauled in each truck; and that the defendant, Bradley, Hinchman, or any person working for any of them, never attempted to influence him in any manner.

Five truck drivers who were employed by the defendant to haul the crushed stone furnished by the plaintiff testified in behalf of the defendant. Their testimony was to the effect that four trucks owned by the defendant, numbered 10, 11, 12 and 13, each of which carried four cubic yards of crushed stone, were used regularly and two or three larger trucks, each of which carried five cubic yards of crushed stone, were used for two or three days at the project; that for every truck load of crushed stone hauled by them they received a ticket which they kept and later during the day delivered to Hinchman; that when they hauled any load of crushed stone before the inspector arrived, which at times occurred, they made a notation of the loads so hauled and reported the number of such loads to the inspector after he arrived and were given a ticket for each of those loads; and that all the crushed stone hauled by them was used on the road.

To controvert the testimony of the witness Cornell in behalf of the plaintiff and to refute his calculation of the quantity of crushed stone furnished by the plaintiff, the defendant introduced the testimony of Poindexter, a regis-

tered professional engineer, and of Moss, a consulting and registered professional engineer.

Poindexter testified that from samples of solid stone and crushed stone which he obtained from the quarry site he determined the specific quantity of the solid stone to be 2.5; that the weight of a cubic yard of the solid stone was 4210 pounds; that the weight of a cubic yard of the crushed stone was 2990 pounds; that the "swell" of a cubic yard of the crushed stone was forty one per cent; and that data contained in engineering handbooks relative to crushed materials are not reliable when applied to the stone obtained from this particular quarry.

Moss testified that he had surveyed and was familiar with the Palermo-Spurlockville road project; that in July, 1950, he measured the area in and about the quarry from which the stone furnished by the plaintiff had been removed; that the total volume of the solid stone that had been removed, including the formation overlying the rock, amounted to 9827 cubic yards; that the waste or spoilage was eight per cent of the total volume, or 786 cubic yards; that after deducting 786 cubic yards from the total volume of 9827 cubic yards the amount of solid stone taken from the quarry was 9041 cubic yards; and that, by adding forty one per cent of that amount, or 3707 cubic yards, as the "swell" of 9041 cubic yards of solid stone when crushed, he determined the total amount furnished by the plaintiff from the quarry to be 12,748 cubic yards of crushed stone.

The plaintiff offered no instructions. The defendant offered six instructions, two of which, No. 2 and No. 4, the circuit court refused to give.

The defendant assigns as error the action of the circuit court (1) in admitting, over the objection of the defendant, evidence of the quantity of crushed stone furnished by the plaintiff as determined by a different method of measurement from that provided by the written contract between the plaintiff and the defendant; (2) in admitting, over the objection of the defendant, evidence of rainfall at Huntington to show the condition of the road bed at the project in

Lincoln County; (3) in admitting, over the objection of the defendant, evidence of the total amount appropriated for the project as a whole and the total amount paid the defendant for the completion of the entire project; (4) in denying the motions of the defendant to direct the jury to return a verdict for the defendant; (5) in refusing to give Instruction No. 2 and Instruction No. 4, offered by the defendant; and (6) in refusing to set aside the verdict which is contrary to the evidence and is without sufficient evidence to support it.

The evidence introduced by the plaintiff of a method of measuring the quantity of crushed stone furnished by him different from the method provided by the contract and the amount of crushed stone furnished, as determined by such different method, was inadmissible and the action of the court in admitting it, over the objection of the defendant, constituted reversible error. The contract prescribed a specific method of measurement to the exclusion of any other method. The doctrine *expressio unius est exclusion alterius*, that the express mention of one thing implies the exclusion of another, is applicable to the contract between the parties. The method so prescribed was available to each party. The defendant used and adopted that method. The plaintiff did not use or adopt it. That he had reasonable opportunity to do so is clearly established by the evidence despite his general statements to the contrary. That he might not have been able to make a count of the number of truck loads of crushed stone without some assistance, or that he did not desire to do so himself, or to incur the expense of employing some person to make and record such count, or to check the count made by the employees of the defendant and the employees of the State Road Commission, is not a sufficient excuse for his failure to make such count or to check the count which the evidence shows was actually made at the project.

The measurement requirement of the specifications, made a part of the contract, could not be disregarded or departed from by the plaintiff without a showing by him

of the existence of some condition which constituted a legal excuse or justification for his failure to satisfy that requirement. He seeks to excuse and justify his failure to use the prescribed method of measurement on the grounds of fraud and error upon the part of the defendant in his use of that method and in the quantity of crushed stone furnished as determined by it.

The evidence offered in behalf of the plaintiff, however, utterly failed to establish fraud upon the part of the defendant or any of his employees or of any of the employees of the State Road Commission in connection with or that affected the measurement made by them. Fraud is never presumed but must be established by clear and distinct proof. *Bennett* v. *Neff*, 130 W. Va. 121, 42 S. E. 2d 793; *McDonald* v. *County Court of Logan County*, 94 W. Va. 773, 120 S. E. 891; *Hunt* v. *Hunt*, 91 W. Va. 685, 114 S. E. 283; *Sansom* v. *Wolford*, 60 W. Va. 380, 55 S. E. 1020. This the plaintiff did not do.

The plaintiff likewise failed to show any substantial error in the quantity of crushed stone furnished as determined by the defendant and the State Road Commission by the use of the method of measurement prescribed by the contract. As already indicated, the only discrepancy between the count made by the employees of the defendant of 12,959 cubic yards, and the count made by the employees of the State Road Commission of 12,955 cubic yards, of crushed stone furnished by the plaintiff, is the insignificant amount of four cubic yards. Though the total number of cubic yards of crushed stone, as shown by the foregoing figures, exceeded the original estimate of 12,000 cubic yards made by the engineer of the State Road Commission, by 959 cubic yards or 955 cubic yards, the excess above the original estimate was caused by the extension of the road for an additional distance of approximately 500 feet which was required by the engineers of the State Road Commission. The testimony of the witness Moss, offered by the defendant for the purpose of refuting the trustworthiness of the method used by the plaintiff of determining the quantity of crushed stone furnished by

measuring the area in and about the quarry from which the solid stone was removed, was that the total amount of crushed stone furnished, as determined by that method, was 12,748 cubic yards, or 207 to 211 cubic yards less than the totals determined by the count made by the employees of the defendant and the employees of the State Road Commission.

The plaintiff testified that more crushed stone than was needed was used and placed at various points on the road, and that some crushed stone was placed when the road was in a muddy condition, but he offered no testimony to show that any of such stone was not included in the count made by the employees of the defendant and the employees of the State Road Commission. If any unnecessary amount of crushed stone was used or any amount of such stone was placed when the road was in a muddy condition, and all of the crushed stone that was used in the construction of the road was correctly counted, as the testimony introduced by the defendant shows that it was, the plaintiff is not prejudiced and he can not complain of the amount of crushed stone so used or of the manner in which it was placed on the road.

The only testimony to the effect that some of the crushed stone used on the project was not counted and included in the count made by the employees of the defendant and the employees of the State Road Commission is the testimony of the witness Hinchman that a small quantity of about five cubic yards of crushed stone was taken and used by employees of the State Road Commission in the construction of a foundation for a house which had been moved in connection with the project. For this small amount of crushed stone, which was not received or used by the defendant, he would not be liable to the plaintiff. The testimony of the plaintiff and of the witness Cornell did not designate any specific error or omission in any of the slips or tickets issued for any truck load of crushed stone furnished by the plaintiff or assail as incorrect the total quantity of such crushed stone, determined by the count made by the employees of the defendant and by the

employees of the State Road Commission, by showing that any estimated or definite amount of crushed stone furnished by the plaintiff was at any time omitted from the count made by them.

When a contract specifies the mode of measurement to be adopted such mode should be followed, and another method of measurement can not be the basis of a recovery. 17 C. J. S., Contracts, Section 367c (1). "When the parties to a contract have fixed upon a certain mode of ascertaining the amount to be paid, the party seeking to enforce that contract must show that he has done everything on his part which could have been done to carry it into effect and he cannot compel the payment of the amount claimed unless he procures the kind of evidence required by the contract or shows that by time or accident he is unable to do so." 12 Am. Jur., Contracts, Section 324. In 9 Am. Jur., Building and Construction Contracts, Section 18, the text contains this language: "The right to compensation is ordinarily determined from the terms of the contract, and the amount thereof when named therein is controlling." In *Blassengame* v. *Boyd,* 4 Cir., 178 F. 1, 23 Ann. Cas. 800, involving a road construction contract which provided for payment to the contractor based on measurement, the United States Circuit Court of Appeals of the Fourth Judicial Circuit held that it was error to base a recovery on estimates determined by a method other than measurement. In the opinion the court said: "If, at the time of suit, conditions were such that measurement was difficult and more or less unsatisfactory, still such fact could never authorize the substitution of a mode of ascertainment never contemplated by the parties; a method which would necessarily leave out of the account the varying elements of physical conditions, weather, accident, diligence, and personal efficiency, all of which are subject to constant variation. Such evidence must at the last amount to mere opinion, and ought not to be made the basis of an accounting under a contract calling for payment upon a basis of measurement." In *Hamilton* v. *Liverpool, London and Globe Insurance Company of Great*

*Britain,* 136 U. S. 242, 10 S. Ct. 945, 34 L. Ed. 419, the court, quoting from *United States* v. *Robeson,* 34 U. S. 319, 9 Pet. 319, 9 L. Ed. 142 used this language: "Where the parties, in their contract, fix on a certain mode by which the amount to be paid shall be ascertained, as in the present case, the party that seeks an enforcement of the agreement must show that he has done everything on his part which could be done to carry it into effect. He cannot compel the payment of the amount claimed, unless he shall procure the kind of evidence required by the contract, or show that by time or accident he is unable to do so." In *The Bowers Hydraulic Dredging Company* v. *The United States,* 41 Ct. Cl. 214, the United States Court of Claims held that "Where the contract prescribed the basis and method of measurement, another method, though customary, can not be the basis of recovery; and expert testimony is not admissible to explain language which needs no explanation." In *Franklin A. Snow Company* v. *Commonwealth,* 303 Mass. 511, 22 N. E. 2d 599, a contractor was denied a recovery for shortages, determined by count of loads, of quantities supplied under a contract which provided a different method. In *Eastman* v. *Cleaver,* 72 Mich. 167, 40 N. W. 238, cited and relied on by the defendant, the holding was that "Where a contract for cutting and manufacturing logs into lumber provides that the product only is to be measured 'when shipped,' there is no occasion for a 'woods scale,' and testimony showing the amount of logs cut is immaterial." In the opinion, with reference to the right of the defendant to show the amount of the lumber measured by the logs cut by him, the court said: "We do not think defendant could properly be allowed to show what logs he claimed to have cut. The contract was express that the product only was to be measured 'when shipped.' There was no occasion, therefore, for any measurement by scaling in the woods; and the testimony actually given of such scaling was very inexact. Defendant's own letters show that a good deal of the cork pine was unsound, and there was testimony further of considerable wastage otherwise. There was no apparent reason for guessing, when, besides the measurement of Mr.

Hile, which was criticised, the lumber was shipped at Escanaba, and must have been measured when loaded, and when discharged. This testimony, as offered and put in, was not made relevant, and should have been excluded."

When, as here, a contract prescribes a designated method of measuring the quantity of material furnished by one party to the contract, which is reasonable and readily available for use by each party and is used by the other party to the contract, the party who furnishes the material will not be permitted to use a different method of measurement to determine the quantity of material furnished by him under the contract.

The plaintiff cites and relies upon the case of *Sigler* v. *Beebe*, 44 W. Va. 587, 30 S. E. 76, to sustain his contention that he is entitled to introduce evidence of a method of measurement of the quantity of crushed stone furnished by him to the defendant wholly different from that prescribed by the contract. The facts in that case differ materially from the facts in the case at bar and the holding in that case has no present application. In the *Sigler* case the contract provided that the plaintiff should saw a certain number of trees at a stipulated price per 1,000 feet to be paid upon estimates at certain intervals at a specified rate; that whatever residue remained unpaid at the completion of the sawing should be paid when the lumber was loaded on cars for shipment; and that the measurement on board the cars when the lumber was ready to be shipped should be the final estimate and basis of settlement. By the contract the defendant was entrusted with the measurement of the lumber in controversy, and the plaintiff had no opportunity to measure it after it was placed on the cars for shipment. The defendant was intoxicated on several occasions and incapable of attending to his duties in attempting to measure the lumber; the lumber received by him was frequently mixed with other lumber; and some of it was sold without having been measured. In these circumstances, and because of fraud upon the part of the defendant and his failure to measure a large portion of the lumber, it was held that the plaintiff was entitled

to determine the quantity of the lumber by the measurement of logs in the woods that were subsequently sawed. If the plaintiff in the case at bar had offered any evidence that any designated person or persons at any reasonably definite time had failed to count, or had incorrectly counted, any specific truck load or loads of crushed stone, or any approximate amount of the crushed stone hauled in the trucks, a different situation would have occurred which might have been within the holding in the *Sigler* case. As previously indicated, however, the plaintiff offered no such proof and, for that reason, the *Sigler* case is distinguishable from the case at bar. In *Maney* v. *Idaho Construction Company,* 30 Idaho 111, 163 P. 297; *Smith* v. *Faris-Kesl Construction Company,* 27 Idaho 407, 150 P. 25; *The Memphis, Clarksville, and Louisville Railroad Company* v. *Wilcox,* 48 Pa. St. 161; and *Illinois Central Railroad Company* v. *Manion,* 113 Ky. 7, 67 S. W. 40, 101 Am. St. Rep. 345, also cited and relied upon by the plaintiff, the facts and the contractual provisions, which dealt with quantity estimates by engineers, are entirely unlike those here involved and, for that reason, those cases are likewise distinguishable from the case at bar.

The certified copy of the record of the United States Weather Bureau made at Huntington for the months of October, 1949, to June, 1950, of the maximum, minimum and average temperatures and the rainfall at Huntington during that period, offered for the purpose of showing the muddy condition of the road bed at the project during that period and admitted in evidence over the objection of the defendant, should have been excluded; and the action of the court in admitting it was error. This record was made at a place forty to forty five miles distant from the project by ordinary travel and approximately twenty five miles distant by airline measurement. It does not show that the same or similar conditions existed at the site of the project, and the plaintiff offered no evidence to that effect. As a general rule, an official record or document kept or prepared by a person whose duty it is truly to record the facts stated in it is, when relevant, admissible as prima

facia evidence of such facts, even though the statements in it are made extrajudicially by a person not under oath, or subject to cross examination, who may have had no personal knowledge of the recited facts, if such record or document was made originally with the intent that it should be kept as a memorial to be referred to and used as evidence. *Riddle* v. *Baltimore and Ohio Railroad Company*, 137 W. Va. 733, 73 S. E. 2d 793, 34 A. L. R. 2d 1228, 32 C. J. S., Evidence, Section 637. The conditions shown by the report to exist at Huntington, however, are not of themselves sufficient to show that they existed simultaneously at the project and, without evidence that these conditions were widespread or extended to the area of the road under construction, any conclusion that they were there present at the same time is based on mere conjecture. *Southern Utilities Company* v. *Murdock*, 99 Fla. 1086, 128 So. 430. In that case a United States Weather Bureau report showing the weather conditions prevailing at Tampa, thirty or forty miles distant from Manatee, where the plaintiff was injured, offered to show the velocity of the wind at the place of the injury, was held to be inadmissible. In the opinion the court said: "The weather conditions prevailing at Tampa or some other point thirty or forty miles distant constituted only a basis for conjecture merely as to like conditions prevailing at the same time in Manatee. The vicissitudes of season or climate if relied upon as important must be proved by the party seeking an advantage therefrom like other facts."

Over the objection of the defendant, the plaintiff introduced evidence that the sum of $170,000.00 was appropriated and the sum of $147,750.13 was paid to the defendant for the completion of the entire project, which embraced excavation work, installation of pipe, and other work in addition to the use of the crushed stone furnished by the plaintiff. This evidence should have been excluded and the circuit court erred in admitting it. It was not pertinent to the issue, which was whether the defendant owed the plaintiff any sum of money for crushed stone furnished by him, and if so, how much. The evidence

relating to the amount of the appropriation and the amount paid to the defendant by the State Road Commission was neither relevant nor material to the issue involved and tended to confuse and mislead the jury to the prejudice of the defendant. Evidence which is irrelevant and immaterial to any issue in a case and which tends to confuse and mislead the jury is inadmissible and should be excluded. *Siever* v. *Coffman,* 80 W. Va. 420, 92 S. E. 669; *Hollen* v. *Crim and Peck,* 62 W. Va. 451, 59 S. E. 172.

The defendant complains of the refusal by the court to give Instruction No. 2 and Instruction No. 4 offered by the defendant.

Instruction No. 2 would have told the jury, in substance, that the method of measuring the amount of crushed stone used upon the road mentioned in the contract and the specifications of the State Road Commission is binding upon the parties to the contract and is controlling; that the quantity of crushed stone for which the plaintiff is entitled to be paid is the number of cubic yards delivered to the trucks of the defendant; that the method of measurement provided by the contract was the only method agreed to be used by the parties; that the jury should not consider evidence of any other method; and that if the jury believed that the defendant had paid the plaintiff for all the crushed stone delivered to the trucks of the defendant at the crusher the jury should find for the defendant. This instruction correctly states the law applicable to the facts shown by the evidence and should have been given; and the action of the circuit court in refusing to give the instruction was reversible error.

Instruction No. 4 would have told the jury that if the jury believed from the evidence that at regular intervals an account was stated and settled between the parties for the crushed stone delivered to the defendant and that the defendant had paid the plaintiff the full amount of each account to the date of such settlement, the accounts as so stated in the settlements should be regarded by the jury as correct and conclusive and could not be changed or

denied unless the plaintiff proved, by clear and convincing evidence, that such accounts were not correct by reason of fraud, accident, mistake or ommission. The instruction was based upon the theory that the installments paid the plaintiff by the defendant represented the amount of crushed stone that had been furnished by the plaintiff at the contract price at the time each installment was paid. The installments did not represent periodic settlements between the plaintiff and the defendant, based on the quantity of crushed stone furnished at the time, but instead constituted partial payments on the account between the plaintiff and the defendant which, in some instances, exceeded the amount of the contract price for the quantity of crushed stone that had been furnished. As the instruction is not based upon the evidence it was properly refused. An instruction which is not sustained by evidence should not be given. *Thrasher* v. *Amere Gas Utilities Company,* 138 W. Va. 166, 75 S. E. 2d 376; *Thomason* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699; *Chesapeake and Ohio Railway Company* v. *Johnson,* 134 W. Va. 619, 60 S. E. 2d 203; *Davis* v. *Pugh,* 133 W. Va. 569, 57 S. E. 2d 9; *State* v. *Humphreys,* 128 W. Va. 370, 36 S. E. 2d 469.

Without the inadmissible evidence of a different method of measuring the quantity of crushed stone furnished from that prescribed by the contract and of the quantity determined by such different method, introduced by the plaintiff, or even if such evidence could properly have been considered by the jury, the verdict of the jury is contrary to the decided weight and preponderance of the evidence and can not stand. "In an action at law, a verdict of a jury which is without sufficient evidence to support it, or plainly against the decided weight and preponderance of conflicting evidence, should upon proper motion be set aside and a new trial awarded." Point 1, syllabus, *Coalmer* v. *Barrett,* 61 W. Va. 237, 56 S. E. 385; *Kap-Tex, Inc.* v. *Romans,* 136 W. Va. 489, 67 S. E. 2d 847. *Ritz* v. *Kingdon,*

139 W. Va. 189, 79 S. E. 2d 123; *Sammons Brothers Construction Company* v. *Elk Creek Coal Company*, 135 W. Va. 656, 65 S. E. 2d 94; *Burgess* v. *Gilchrist*, 123 W. Va. 727, 17 S. E. 2d 804, 138 A. L. R. 676; *Huntington Development and Gas Company* v. *Topping*, 115 W. Va. 364, 176 S. E. 424; *Armour Fertilizer Works* v. *Finnell*, 112 W. Va. 325, 164 S. E. 253; *Cannady* v. *Chestonia*, 106 W. Va. 254, 145 S. E. 390; *McKown* v. *Citizens State Bank of Ripley*, 91 W. Va. 716, 114 S. E. 271; *Dexter and Carpenter, Inc.* v. *Co-Operative Fuel Company*, 90 W. Va. 465, 111 S. E. 153; *Palmer* v. *Magers*, 85 W. Va. 415, 102 S. E. 100; *Griffith* v. *The American Coal Company*, 78 W. Va. 34, 88 S. E. 595; *Kelley* v. *Aetna Insurance Company*, 75 W. Va. 637, 84 S. E. 502; *Fuccy* v. *Coal and Coke Railway Company*, 75 W. Va. 134, 83 S. E. 301; *Sims* v. *Carpenter, Frazier and Company*, 68 W. Va. 223, 69 S. E. 794; *Priddy* v. *Black Betsy Coal and Mining Company*, 64 W. Va. 242, 61 S. E. 163; *Chapman* v. *Liverpool Salt and Coal Company*, 57 W. Va. 395, 50 S. E. 601; *Limer* v. *Traders Company*, 44 W. Va. 175, 28 S. E. 730.

The judgment of the circuit court is reversed, the verdict of the jury is set aside, and this case is remanded to that court for a new trial which is here awarded the defendant.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*