# CHARLESTON.

DEXTER & CARPENTER, INC. v. CO-OPERATIVE FUEL COMPANY.

Submitted February 28, 1922.    Decided March 7, 1922.

1. APPEAL AND ERROR—*Verdict Contrary to Weight and Preponderance of Evidence Should be set Aside.*

   Where the verdict of a jury is contrary to the decided weight and preponderance of the evidence, it should be set aside, notwithstanding the evidence may have justified the giving of instructions based thereon.    (p. 470).

2. SALES—*Where Goods are Sold Without Opportunity for Inspection, Buyer May Recover the Difference Between the Contracted Value and the Value with the Defects Shown; Return Not Condition Precedent to Recoupment.*

   When goods are sold to be of a particular kind or quality, and there has been no inspection or opportunity of inspection and the buyer relies on the seller to deliver the goods contracted for, the purchaser may, when sued by the seller for the price thereof, recoup in damages the difference between the value which the goods sold would have had at the time of delivery if of the kind and quality corresponding to the warranty, and the actual value thereof at the same time with the defects shown; and it is not a condition precedent to such right that the purchaser should have notified the seller and offered to return the goods.    (p. 470).

Error to Circuit Court, Mercer County.

Action by Dexter & Carpenter, Inc., against the Co-operative Fuel Company.    Verdict and judgment for plaintiff, and the defendant brings error.

*Reversed and remanded.*

*Arthur E. Kingdon,* for plaintiff in error.
*Lee & Tanner,* for defendant in error.

MILLER, JUDGE:

On notice of a motion therefor the plaintiff obtained a verdict and judgment for the sum of $922.21, the full amount

sued for, and we awarded defendant the present writ of error to review the judgment pronounced on the 11th day of June, 1921.

What plaintiff sued for was the price of two car loads of coal, sold and delivered to defendant, the first on November 5, 1920, containing 41.40 net tons at $9.00 per ton, amounting to $372.60; the second on November 10, 1920, containing 58.70 net tons at $9.00 per ton, amounting to $528.30, which with interest to the date of the notice totaled $918.90, and at the date of the verdict, $922.21, the amount of the verdict and judgment.

Besides the general issue of non assumpsit, the defendant filed a plea of tender before suit and on the trial, of $282.48, also a notice of recoupment of damages for breach of the contract by plaintiff in furnishing coal of an inferior quality to that of Standard Pocahontas R O M coal contracted for, and for which defendant was only able to realize the sum of $385.91, and was obliged to pay demurrage and switching charges amounting to $53.38, and on which coal it was entitled to a profit of fifty cents per ton, or $50.05, leaving a net balance of $282.48, the amount tendered, entitling defendant to recoup in damages the difference between $900.90, the principal sum sued for, and the sum of $282.48, or the sum of $617.42, which it would undertake to offset against plaintiff's demand.

It is agreed that the memorandum orders accepted by plaintiff show that the coal contracted for was what was known in the market as Standard Pocahontas R O M (run of mine) coal. And according to these memoranda the coal was to be shipped to defendant at Portsmouth Scales, Ohio.

The main controversy before the court and jury was whether the two cars of coal sued for were in fact Standard Pocahontas ROM coal; and much testimony of witnesses was introduced on this question. It was fully proven that these two cars of coal came from what is known as the J. B. B. mines, in McDowell County, and were billed and shipped to Portsmouth, Ohio, not in the name of the defendant, but in the name of the plaintiff, where there was a joint agent or shipping clerk, who received them and rebilled and shipped them to defendant's customer, the Ford Motor Company, at

Detroit, Michigan, where they were received a few days later, and were after analysis rejected, apparently on the ground that the coal was too high in ash qualities; and plaintiff was so notified through its agent at Bluefield, W. Va., where the contract was made, by the agent of the defendant company, also located there.

It is proven that the coal from the J. B. B. mines, owned and operated by plaintiff, was generally good coal, and was, when properly mined and delivered in the cars, accepted in the market as Standard Pocahontas ROM coal. The witnesses for plaintiff and defendant, however, differ as to the proper manner for preparing the coal for shipment at the mines. One or two of defendant's witnesses say that, at some mines at least, the coal is first run over screens, and the lump, egg, nut and slack thereby separated and delivered on to different tables, where it is picked and the impurities removed, and when so treated, Standard Pocahontas ROM coal is produced by reassembling the different lots in about the proportion it comes from the mine, namely, 40% to 50% lump, egg and nut, and 50% to 60% slack, and then delivered into the cars for shipment. It is proven and agreed that the J. B. B. mines have no equipment for purifying and preparing the coal for market in this way; but witnesses for plaintiff say that Standard Pocahontas ROM coal does not call for such treatment; that run of mine means the coal just as it is mined and hauled out of the mine and dumped into the cars. Notwithstanding this claim, plaintiff's manager at Bluefield says on cross-examination that Standard Pocahontas run of mine for the United States Navy is fixed as to quality by chemical analysis, but that when sold elsewhere the designation Standard Pocahontas ROM has no meaning other than run of mine. Accepting this as the true basis for marketing the coal, however, the evidence satisfies us that run of the mine coal from the mines of plaintiff would produce lump, egg, nut and slack in about the proportion named, that is, 40% to 50% lump, egg and nut, and 50% to 60% slack, and that the chemical analysis should not show over 4% to 6% ash, and that a showing of a greater percent of ash would

mean dirty coal, not properly classified as Standard Pocahontas ROM coal.

But whatever may be the true method of producing and classifying Standard Pocahontas ROM coal, it is conceded by plaintiff that coal so classified and sold in the market, whether at the seaboard or inland, has good heat producing and other qualities, and is free from impurities rendering it practically worthless for steam and domestic purposes. So that for the purposes of this case it becomes of little importance whether the one or another method of producing such coal be the proper one; to answer the reasonable requirements of such coal for steam or domestic uses it should come up to the quality of coal sold as Standard Pocahontas ROM coal. Otherwise the seller could not know what he was selling, nor the buyer what he has contracted for. After this case arose the plaintiff took samples by pick from the face of one of its mines and had them analyzed, and proved by this analysis that they showed a low percentage of ash, not over 4% ; and plaintiff proved by the same witnesses that the average per centum of ash in the Standard Pocahontas ROM coal runs not to exceed 7% of ash. The customer of defendant, the Ford Motor Company, in rejecting the particular coal in question, replied that the coal in the two cars rejected showed an ash test of over 12%. Objection was made to this evidence because hearsay, the chemist of the Ford Motor Company who made the test not being found or examined; but this was the ground of objection by the Ford Motor Company, and it is conceded that a coal showing this high a percentage of ash would be a dirty coal, and much higher showing than the coal from the Pocahontas field should develop. However, defendant does not rely wholly on the test supposed to have been made by the Ford Motor Company. After the coal was rejected a representative of the defendant was sent to Detroit, and was told that he might have it analyzed at the Ford company's expense, and if it showed the proper test, the Ford company would take it and pay for it. The coal was identified by the numbers of the cars in which it was shipped. Defendant's representative concluded that it was useless to have the test made, and he set out to make the best disposition

of the coal that he could. He succeeded in selling both loads to J. W. Dykstra & Company, a coal dealer at Detroit, at the price shown in defendant's recoupment, who in turn disposed of car I. C. 118519 to the Peoples Coal & Coke Company, dealers at Detroit, and the other car N. & W. 47350 to R. A. Holland at Walkerville, Ontario. Each purchaser swears that the coal in the car purchased was not Standard Pocahontas coal. The purchaser of I. C. car No. 118519 said it looked like nut, pea and slack; and the witness Michalak, of the Peoples Coal & Coke Company, swears that the car bought by his company was mostly fine slack and was mixed with sand; that one purchaser to whom he sold a part of it complained, and when he went to investigate he found his furnace choked; that he advised buying some lump coal to mix with the other, which was done, and still it would not work in the furnace, and he had to remove the coal from the cellar of his customer; that other complaints were made by other customers; that they still had a greater part of the coal on hand; and that his company had complained to J. W. Dykstra about the coal, and had not paid for it. The Ontario customer testified to the bad qualities of his coal; said that on account of its quality the Canadian government had made him a rebate of the difference between fifty-three cents, the regular customs duty per ton on the class of coal purchased, and fourteen cents a ton, the rate on inferior coal such as he got in the car purchased. There is some evidence tending to show that exposure of the coal to weather may have accounted for the disintegration shown, but this would not account for the dirty condition and bad quality of the coal as shown by the positive evidence of the witnesses. It is conceded that these cars of coal had no substantial inspection at the mines before shipment. Plaintiff had only one inspector to inspect as many as fifty cars a day, produced at five different and widely separated mines; and he says he could not be at the mines when the coal was being run and dumped into the cars. This coal had no inspection until it reached Detroit. The purchaser at Walkerville, Ontario, says he used the coal himself and would not have purchased it at all if he had seen it before hand. Plaintiff offered no evidence of the character of these

two loads of coal except the general statement of its superintendent that it was run of the mine coal. These cars were two of the six sold to the Ford Motor Company. The four other cars were accepted without objection. Why not these two, if Standard Pocahontas ROM coal? There could be no reason for the Ford company rejecting these and not the four cars accepted, except that the coal was bad and inferior and not of the quality of the four other cars. There is some evidence that about the time this coal was loaded the plaintiff had been engaged in robbing its coal of egg and nut to fill orders for those grades of coal. But while significant, we do not think this fact material.

Upon the whole evidence we think the plaintiff failed to make even a prima facie case of compliance with its contract, and that the verdict of the jury was contrary to the plain preponderance of the evidence. Where the verdict of the jury is contrary to the decided weight and preponderance of the evidence, notwithstanding the evidence may have justified the giving of instructions based on it, it will be set aside. *Fuccy* v. *Coal & Coke Ry. Co.,* 75 W. Va. 134, 141.

But it is said it was the duty of the defendant, if the coal was not of the quality called for by the contract, to reject it and notify the plaintiff, and give it opportunity to re-sell or give orders for its disposition; that having accepted and sold it, defendant was bound for the full price regardless of the quality or character of the coal; and such seems to have been the theory of the trial court as evidenced by instructions given to the jury and refused. The coal was shipped, not to the defendant at Portsmouth Scales as stipulated in the order, but to the plaintiff itself, and there turned over to defendant through a joint agent. There was no opportunity there to properly inspect the coal in the cars; and it must have been known to the plaintiff that the only one there to look after the coal was the billing or shipping clerk, employed to rebill and forward the coal to defendant's customers. The coal was sold f. o. b. cars at the mines, and certainly there was no opportunity there for the defendant to inspect it. Viewing the coal from the top of the car would not ordinarily furnish adequate opportunity for inspection. In the case of *Wilson*

v. *Wiggin,* 73 W. Va. 560, we held that under such circum-
stances the purchaser, if the goods are not of the kind and
the quality contracted for, though he has not returned or of-
fered to return them, or notified the seller of the defect,
may plead the breach in recoupment of the purchase price,
when the seller sues therefor. And subsequently, when this
case was again before us on writ of error, we decided that the
true measure of damages in such cases is the difference be-
tween the value which the goods sold would have had at the
time of delivery if of the kind and quality corresponding to
the warranty, and the actual value thereof at the same time
with the defects shown.

And in Virginia, the Supreme Court of Appeals held that
a purchaser is not estopped from claiming damages for such
breach because he has given no notice to the seller of his claim.
*Eastern Ice Company* v. *King,* 86 Va. 97, 102.

In the case here the evidence satisfies us that the defendant
sold the coal at the very best price obtainable in the market,
on the basis f. o. b. cars at the mines, and thereby mitigated
the damages which it was entitled to recoup against plaintiff.

In so far as the instructions given and refused are not in
accord with the foregoing principles, they should, on the new
trial about to be awarded, be refused or modified.

The judgment will be reversed, the verdict set aside, and the
defendant awarded a new trial.

*Reversed and remanded.*