ROCKINGHAM POULTRY MARKETING COOPERATIVE, *Inc., A Corporation*

*v.*

THE BALTIMORE AND OHIO RAILROAD COMPANY, *A Corporation*

(No. 11099)

Submitted September 13, 1960. Decided December 20, 1960.

*Ailes & Ansel, Harry H. Byrer,* for plaintiff in error.

*Ralph W. Haines,* for defendant in error.

BROWNING, PRESIDENT:

Rockingham Poultry Marketing Cooperative, Inc., hereinafter referred to as plaintiff, instituted this action of trespass on the case in the Circuit Court of Hampshire County to recover damages arising out of a collision between its tractor-trailer unit and a train

belonging to the defendant, The Baltimore and Ohio Railroad Company. Upon the trial of the case the jury returned a verdict in favor of the plaintiff in the amount of $6,575.00 and judgment was entered thereon, to which judgment this Court granted a writ of error and supersedeas on November 23, 1959.

The collision occurred about 2:45 P. M. on February 6, 1953, at a point where U. S. Route 50 intersects a branch line of the defendant, approximately one mile west of the Town of Romney, and known locally as the Vanderlip or West Romney crossing. Route 50, a concrete highway with some tar or asphaltic patches in that vicinity, runs approximately in an east-west direction and the railroad north and south. It was raining and the highway and the rails of the defendant were wet.

The operator of plaintiff's tractor-trailer was proceeding along Route 50 in a westerly direction. He testified, substantially, that: He had been employed as a truck driver by the plaintiff for approximately six or seven years and would average traveling over the Vanderlip crossing six times a week in going to and from Moorefield and Pittsburgh, Pennsylvania; on one or more occasions previously he had observed a flagman at the crossing and on one particular occasion had slowed his vehicle until waved on by the flagman; he was proceeding at approximately forty miles an hour as he crossed a bridge a short distance east of the crossing; he slowed to a speed of twenty-five miles an hour, his view of the railroad to the south being obstructed by brush and timber; upon reaching a point 100' to 150' east of the crossing he obtained his first clear, unobstructed view of the railroad to the south, at which time he observed the train of the defendant, then approximately 500' from the crossing, approaching from the south; at this same moment he first heard the operator of the train blow its horn; he applied his brakes, the tractor-trailer started to "jackknife" and, fearing to lose complete control of his vehicle, he released his brakes and increased his speed in an effort

to beat the train over the crossing; the train struck the rear of the tractor, disengaged the trailer therefrom and pushed the trailer 300' north of the crossing; and, if the vehicle had not "jackknifed" he could have stopped short of the crossing. He is corroborated as to the "jackknifing" by disinterested witnesses who also testified that the train, in pushing the trailer before it for 300', destroyed a power pole, a railroad switch, railroad "cross-arms" signifying a railroad crossing, dragged an automobile parked near the track fifty to seventy-five feet and scraped over a concrete abutment.

For the defendant, the engineer of the train testified that he had started to blow the horn some 1,500 to 2,000 feet from the crossing; the bell was ringing; the headlight was burning; the train was proceeding at a speed of from eighteen to twenty miles an hour; he first observed the tractor-trailer when the train was approximately 650' from the crossing and intermittently thereafter; he observed nothing to indicate the tractor-trailer was in difficulty; when the tractor-trailer was approximately 100 to 150 feet from the crossing, and the train approximately 500' therefrom, he noted that the truck was not going to stop and applied the emergency air brakes and sand; the brakes had been tested before leaving Petersburg and found in good working order; the maximum speed limit along the branch line was twenty-five miles an hour; and, though the rules and regulations of the defendant required south bound trains to stop and flag vehicular traffic at the crossing before proceeding, such regulations did not apply to north bound trains. The fireman on the train corroborated the engineer as to the approximate speed, the blowing of the horn, the ringing of the bell and the distance from the crossing when the emergency brakes and sand were applied. The defendant's witnesses also testified that the train consisted of a 1,000 horsepower engine, ordinarily used for switching purposes in a yard, eight cars, four of which were loaded and four empty, and a caboose. The trainmaster of the defendant testified that from "my observation of this type of

train at the same crossing on previous occasions'' the distance within which the train could stop upon an emergency application of the brakes on dry rails would be ''9 or 10 car lengths'' based on an average of forty-five feet to a car. He also testified that on wet rails the distance would be two or three car lengths farther.

In rebuttal the plaintiff introduced the testimony of a fireman and ''promoted'' engineer employed by the Western Maryland Railroad who testified that the type of train involved in the collision proceeding at a speed of twenty miles an hour should be stopped five or five and one-half car lengths after an emergency application of the brakes.

Errors assigned in this Court concern the trial court's overruling the demurrer to the third count of the declaration and the motions of the defendant to direct a verdict in its favor; the giving and refusing of certain instructions; and, in refusing to set aside the verdict as contrary to the law and the evidence.

This case was tried before the regular Judge of the Circuit Court of Hampshire County and a jury, with the plaintiff securing a verdict in the sum of $6,575.00, as heretofore stated. The presiding Judge overruled the defendant's demurrer to the three count declaration, and error is assigned only as to the court's ruling in that regard with respect to the third count.

While possibly prolix, this count of the declaration properly alleges grounds for recovery under the last clear chance doctrine, and the demurrer thereto was properly overruled. Likewise do we summarily dispose of the assignment of error upon the refusal of Defendant's Instruction No. 14. That is a binding instruction vitiated by the failure to include all of the elements which the jury should have considered in finding a verdict for the defendant. The trial court gave the other thirteen instructions offered by the defendant. Plaintiff's Instruction D was a good last clear chance instruction, assuming that the evidence justified the court in giving it. Plaintiff's Instruction E told the

jury that they should find for the plaintiff if they believed from a preponderance of the evidence that the defendant was guilty of negligence as charged in the declaration, and that such negligence was the sole proximate cause of the collision if they further found plaintiff was not guilty of contributory negligence.

It is apparent that the real issue before this Court upon this writ of error is whether the evidence adduced at the trial was such as to present factual questions for jury determination. It is not often that a case comes to this Court upon writ of error where this is the sole ground of reversible error to be decided by the Court, when its determination does not present to the Court a perplexing problem.

At the end of the plaintiff's evidence the trial court denied a motion for a directed verdict, and, after the transcript of evidence was available, an opinion was written which is a part of the record stating the reasons for that action. The defendant's motion for a directed verdict at the end of all of the evidence was likewise overruled, and the trial judge prepared a written opinion stating his reasons for overruling that motion, which is also contained in the record of this case. The Judge who presided at the trial was succeeded in that office by another person prior to passing upon the motion of the defendant to set aside the verdict and grant defendant a new trial. That Judge, considering himself disqualified, by "arrangement" secured the services of the Honorable Ernest A. See, Judge of an adjoining circuit, who, sitting as a special Judge of the Circuit Court of Hampshire County, overruled the defendant's motion and entered judgment upon the verdict. The reasons for his action are assigned in an extensive opinion, which is also a part of the record in this case.

We have said that when a person comes to this Court with a verdict of a jury, approved by the trial court, he is in the strongest position known to law. If that be true this plaintiff comes to this Court in an auspicious position indeed. However, even though that is

true, this Court has reversed many such judgments and set aside many such verdicts upon the ground that the verdict was not supported by the evidence, or was against the plain preponderance of conflicting evidence, in which case a question of law arises for a court. Particularly is that true where the verdict is founded upon a mistaken view of the law.

In *Bower v. Brannon,* 141 W. Va. 435, 90 S. E. 2d 342, this Court made this comment: "* * * However, a decision as to where the province of a jury ends, and that of a court begins, upon questions of fact, must be determined by the evidence in each case. Many well established principles are helpful. If there is no evidence to support the verdict of a jury, or if it is against the plain preponderance of conflicting evidence, it must be set aside. If reasonable men cannot disagree upon the facts, a matter of law arises for the court, but learned judges sometimes do not agree as to whether the facts in a particular case are such that reasonable men could reach only one conclusion therefrom. There is no rule or principle of law that can serve as a definite guide post to point the way to a specific line of demarcation in this nebulous realm where the rights, duties and responsibilities of a court and jury meet. * * *"

The decisions of this Court uphold the contention of the plaintiff in error that a railroad company has the right of way at a vehicle crossing. *Bean v. Baltimore and Ohio Railway Co.,* 121 W. Va. 105, 1 S. E· 2d 881; *Maynard v. Chesapeake and Ohio Railway Company, et al.,* 111 W. Va. 372, 162 S. E. 171; *Robertson v. Monongahela Power & Railway Co.,* 99 W. Va. 356, 128 S. E. 829. It is common knowledge that the driver of a motor vehicle like his predecessor, the driver of a team of horses, has the opportunity of maneuverability to avoid a collision with a train at a crossing which the operator of a train does not have. The train must travel on the rails and cannot turn to the right or to the left. Furthermore, the weight of the train is such that it cannot be stopped within the

distance in which a motor vehicle if properly handled may be stopped, but a railroad company can be guilty of negligence in colliding with a vehicle upon a crossing, and the evidence may be such that the driver of that vehicle will not be held to have been guilty of such negligence as will prevent his recovery against the railroad company. The 3rd Syllabus Point in *Canterbury v. Director General of Railroads and Wilson*, 87 W. Va. 233, 104 S. E. 597, states: "In determining whether or not a traveler crossing a railroad at a highway crossing is guilty of contributory negligence, so as to bar a recovery by him for an injury received by being struck by a train at such crossing, the jury must consider all of the facts and circumstances shown in the case, including the speed of the train, the fact that such train did or did not give the usual crossing signal, the distance at which an approaching train could be observed by one going upon the crossing, the care exercised by such injured party before entering thereon, and if from all of these facts it appears that the injured party has taken such precautions as would have been taken by one of ordinary prudence under the circumstances, he will not be held guilty of contributory negligence." This language was subsequently quoted with approval in *Coleman v. Norfolk and Western Railway Co.*, 100 W. Va. 679, 131 S. E. 563. There are, of course, many other decisions of this Court upon these questions, that is, negligence and contributory negligence by a railroad company and the driver of a vehicle involved in railroad crossing collisions. 15 M. J., Railroads, §71, et seq.

There was sufficient evidence for jury determination as to the primary negligence of the defendant without which we would not reach the questions of contributory negligence and last clear chance. In addition to the engineer and the fireman two of the three other employees of the defendant, who were riding at the rear of the train in the caboose, testified. They were Kerr, the conductor and Turley, a brakeman. The third employee, a Mr. Belt, died prior to

the trial. On direct examination Kerr stated that as the train approached the crossing he heard the horn blow. He was then asked these two questions and made these answers:

Q: "Do you know where the engine was when the horn started to blow?

A: "No, sir, I don't.

Q: "Do you know where your caboose was when he started to blow?

A: "A little West of the bridge. Don't know exactly the location."

Turley was asked these two questions and made these answers:

Q: "Mr. Turley, did you hear the whistle and horn signal sounded by the diesel engine on that occasion?

A: "I could not say I did. I could not swear. They always blow at every place.

Q: "Do you always hear them?

A: "Not all the time."

Crider, a witness for plaintiff who was riding in the truck as a passenger with the driver, was asked these questions and made these answers:

Q: "When did the horn sound on the train?

A: "While on the trestle.

"* * *

Q: "Did you hear it before that?

A: "No, sir.

Q: "Did the train engineer or personnel give any signal before the locomotive was on the trestle?

A: "No, sir."

The answer to the last question is unequivocal and does not constitute the negative testimony which this Court has held not in conflict with positive testimony of witnesses that a locomotive gave proper signals as it

approached a highway crossing. Compare *Snyder v. Railroad Co.*, 135 W. Va. 751, 65 S. E. 2d 74; and the two previous decisions of this Court cited therein.

There was no device upon this train by which its crew could determine its speed. They did so only by estimates. The engineer testified that he "applied the brakes in emergency" when he was five hundred feet from the crossing and the evidence shows that the train stopped about three hundred feet beyond that point. As heretofore noted the defendant's train-master testified that, under the circumstances then existing, a similar train should have been stopped within eleven to thirteen carlengths, or a distance of from 495 feet to 585 feet. The rebuttal witness for the plaintiff testified that this train should have been stopped within a distance of approximately two hundred and twenty-five feet after the brakes were applied in this manner if the train was traveling at the speed of twenty miles an hour. There was a sufficient conflict in the testimony to present a jury question as to the primary negligence of the defendant. That was true also of the issues of contributory negligence and last clear chance. The plaintiff in error correctly contends that the highway was wet with rain which required more than usual care on the part of the operator of the truck as he approached the crossing. It was raining in this area at the time of the collision and had been most of the day, but the rain fell upon the steel rails of the railroad company as well as upon the concrete of the highway. The uncontradicted evidence shows that vehicular traffic is heavy over this highway at that particular place. The evidence shows that this train could have been stopped in a much shorter distance on dry rails than on rails that were slippery with water.

This was a general jury verdict and it is not possible to determine upon what issue or issues the jury found for the plaintiff. Upon the assumption, however, that they found the defendant guilty of primary negligence and the plaintiff guilty of contributory

negligence, there was evidence from which it still could have found its verdict for the plaintiff under the last clear chance doctrine. The evidence of the plaintiff is uncontradicted as to the jackknifing of the truck when the driver, realizing his peril, applied his air brakes. The engineer of the train testified that he had observed the tractor-trailer as it approached the crossing and that he "looked" back and forth from the crossing to the tractor-trailer two or three times, and "I saw that he was not going to get stopped. At about that time I was at the East end of the trestle." On cross-examination the witness further testified:

> Q: "Could you tell whether his vehicle was skidding or slipping?
>
> A: "No, sir. I was looking at the man. Could not tell whether it was skidding, jackknifing or what.
>
> Q: "You were aware of the fact he was not going to make it?
>
> A: "That is right sir."

The plaintiff's evidence shows that the train was approximately five hundred feet from the crossing at the time the engineer made this observation.

"In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, assumed as true." Pt. 1, Syllabus, *Butcher v. Stull,* 140 W. Va. 31, 82 S. E. 2d 278. *Bower v. Brannon,* 141 W. Va. 435, 90 S. E. 2d 342.

This Court finds no reversible error in the record of this case and the judgment of the Circuit Court of Hampshire County, upon the jury verdict for the plaintiff in the sum of $6,575.00, will be affirmed.

*Affirmed.*