336 S.E.2d 190

**Grat WEST and Mila West**

v.

**NATIONAL MINES CORP., etc., H & S Coal Co., a corporation; F & F Coal Co., a corporation, C.L. Coal Co., Inc., a corporation and Economy Fuel Co., Inc., a corporation.**

No. 16288.

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1985.

Decided July 9, 1985.

Rehearing Denied Nov. 8, 1985.

D. Grove Moler, Mullens, for appellant.

E. Glenn Robinson, Charleston, Robert M. Worrell, Robert Browning, Jr., Paul R. Goode, Jr., Pineville, for appellees.

PER CURIAM.

This is an appeal from a final order of the Circuit Court of Wyoming County which denied the appellants' motion for a new trial and for permanent injunctive relief. The primary issues on appeal are the propriety of the jury verdict and the trial court's dissolution of a previously awarded temporary injunction. After careful review of the record, we conclude that although the jury verdict was weakly supported by the weight of the evidence, the dissolution of the temporary injunction was improper, and, we must therefore reverse.

The case was originally before this Court on an appeal from the dismissal of a complaint by the appellants and the denial of temporary injunctive relief in their favor. *West v. National Mines Corp.*, 168 W.Va. 578, 285 S.E.2d 670 (1981). With respect to the cognizability of their complaint, this Court held in Syllabus Point 1 that:

A complaint that alleges an unreasonable, negligent, or unlawful use of public property which materially impairs the right of another to the enjoyment of his house and infringes upon the well-being, comfort, repose, and enjoyment of the regular, natural person residing therein, states a cause of action of which the courts of this State have cognizance.

With respect to the injunction issue, this Court stated that:

Given the gravity of harm to which the appellants have been subjected by the appellees' coal hauling activities, and the absence of evidence of any hardship which abatement of the nuisance would impose upon the appellees, we find that the trial court abused its discretion by

denying the appellants' motion for preliminary relief. From the evidence produced at the hearing we must conclude that the appellants are entitled to a preliminary mandatory injunction requiring the appellees to abate the dust nuisance caused by the haulage of coal along route 8/1 from National's leasehold to its preparation facility.

*West v. National Mines Corp.*, 168 W.Va. at 592, 285 S.E.2d at 679.

Pursuant to our opinion, the Circuit Court of Wyoming County issued the preliminary injunction which required the appellees to treat the road with water or other lawful application; to travel the route at reduced speeds to minimize the creation of dust; and, to operate the coal trucks in such a manner as to eliminate spillage. It appears from the evidence that compliance with the terms of this preliminary injunction has significantly reduced the dust problem.

On October 10, 1983, the case went to trial. Although testimony was presented on the severity of the dust problem, including the frequency of household cleaning, the damage to vegetables in the garden, the boiling of drinking water, and the wearing of surgical masks, the jury found that there were no damages.

In Syllabus Point 17 of *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974), this Court restated the general rule that:

In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

*See also* Syl. pt. 5, *Poe v. Pittman*, 150 W.Va. 179, 144 S.E.2d 671 (1965); Syl. pt. 3, *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963). Having reviewed the record and verdict, while giving every reasonable and legitimate inference to the appellees, we reluctantly affirm on the issue of damages.

Regarding the preliminary injunction issue, however, our perusal of the record requires us to conclude that the dissolution was procedurally improper. We stated in Syllabus Point 4 of *United Maintenance and Manufacturing Co. v. United Steel Workers of America,* 157 W.Va. 788, 204 S.E.2d 76 (1974) that,

> After an evidentiary hearing on a complaint for a permanent injunction, a trial court is required to make a finding of fact and conclusion of law under Rule 52 of the West Virginia Rules of Civil Procedure, and findings and conclusions also should be made upon ruling on a motion to dissolve an injunction in order to assist appellate courts in determining whether there is a legitimate area for state regulation by injunction.

The trial court in the case at bar failed to set forth any findings of fact or conclusions of law in its sua sponte dissolution of the temporary injunction. Consequently, the trial court's noncompliance with Rule 52 of the West Virginia Rules of Civil Procedure leaves this Court questioning the rationale for the dissolution.

For the foregoing reasons, we direct the Circuit Court of Wyoming County to make findings of fact and conclusions of law and to reinstate the injunction. Therefore, we affirm the jury verdict and reverse and remand the order which dissolved the preliminary injunction.

Affirmed in part; reversed and remanded in part.

McGRAW, Justice, concurring in part and dissenting in part:

Although I concur in the majority's reinstatement of the injunction against the appellees in this case, even indulging every reasonable and legitimate inference in favor of the appellees compels an unmistakable conclusion that the verdict of the jury was decidedly against the clear and unequivocal weight of the evidence presented.

Grat West, since deceased, who suffered from both heart and lung disease, testified that the dust created by the appellees' activities adversely affected his ability to breathe, and, particularly, made sleeping difficult. In fact, he admitted on cross-examination that at one point the dust became so oppressive that he placed oil on the road even though he was aware of its illegality, protesting that, "Is it against the law ... to try to save your life." When asked concerning his description of the dust problem, Mr. West replied:

> The nearest word I know to use is horrible. Dust was so bad you couldn't even. ... A truck go by and you couldn't even see whether it was a truck or mule because the dust was so bad. It would get into the air, hang up there like a cloud, hung there all day and all night. You could go out on the porch sometimes 1:00 or 2:00 o'clock in the morning, midnight at night and try to get a breath of fresh air, and the dust is just as bad then as it is in the day because if you open your mouth your mouth is filled up with it, and they never made any attempts to do anything with the dust. I personally have begged everyone of them, pleaded with them to just help do something with it. Each one would say the fault belonged to the other one, and that went on and on and on until suit was finally brought.

Mila West, Grat's wife of forty-nine years, testified primarily concerning the domestic difficulties created by the dust. She described the dust as having "an oily texture" that made it "something that you can't wash off." She related that the dust permeated the house, including enclosed areas such as closets and cupboards, as a film so thick "you can write your name," requiring removal of the draperies twice weekly for cleaning. Mrs. West also testified concerning the blanket of dust outdoors surrounding her home, stating that, "It is on my corn; it is on my cucumbers; on my tomatoes; on anything in the garden," and "when you go to push the lawn mower ... the dust would just boil up." Finally, at the conclusion of her direct examination, Mrs. West asked if she could state that:

> It is awfully hard to have to live with my husband, sleep with him in the bed, listen to him turn over. Every time he turns

over, even in oxygen, he is coughing, and in the last little while he has began to cough up, I guess, about two spoonfuls of blood at the same time, and this is just getting worse instead of getting better. The oxygen is not doing the job. The doctors told me it wouldn't, so I don't know. That is what I was wanting to say. It just interrupts your whole life.

Debbie Christine West Rambo, the West's daughter, who had periodically lived and visited with her parents during the time in question, also testified concerning the extent of the dust problem. In addition to corroborating her parents' testimony, she testified that laundry could not be hung outside to dry during the week when the coal trucks were operating; that some produce had to be occasionally discarded when it could not be cleaned thoroughly; that even in the heat of summer all the doors and windows had to be closed to fight the dust; and, that the dust was so thick at times that it hung as a cloud obstructing vision of the roadway.

Donald Ellis, a school bus driver who traveled the route in question, also testified as to the enormity of the dust created by the coal trucks. He stated that, "[I]t would have an effect on your vision. I have met say two or three trucks coming and I would have to pull over and stop and maybe they would have their headlights on for safety reasons." Ellis attributed a great deal of the dust raised to the practice of operating the coal trucks in close proximity with one another. Often, Ellis testified, "you would meet three or four at a time."

Joe Blankenship, chief of police of Gilbert, also testified on behalf of the appellants. He stated that at the times he was at the appellants' home, "There was always dust," and that, "All the trees always had dust on them." He further testified that the coal truck drivers "drove pretty fast," and that, as a result, "a lot of dust" was created.

Flora Lester, the appellants' next door neighbor, described her experience with the dust created by the coal trucks:

[W]hen they were running it was almost impossible to live there. We've got so disgusted if we had anywheres else to went we would have went, but it was the only place we had to live, so we had to live there. We couldn't get out, we had to keep the doors and windows closed all the time when they were working. You couldn't even get out in the yard. The lawn, it was so nasty you couldn't. It was—well, if people didn't know it stayed dusty like that it made you feel awful for somebody to come look at your porch or your windows on the outside, the walls, anything. Even the vegetables in the garden or anything, it were covered with it, just a oily fumes. Doors and windows was closed. You could go to bed at night and smell it in the bed clothing. In your closets; it got anywheres, just anywheres. You think there wasn't a hole to get in there, but it did.

Sheila Browning, the appellants' other next door neighbor, also described her family's dust difficulties:

Even one coal truck would stir up a lot of dust, but sometimes there was two or three would go up one right after the other one, and it would be five minutes before you could ever see our mailbox, which is right in front of the house, and when I would hang clothes out on the clothesline and leave them hanging long enough to dry, you could shake the dust out of them. And in the summertime we didn't even take our storm windows out ... we had to leave our storm windows in the trailer to keep the dust from coming in the trailer.

Roy and Vergie Walker, Sheila Browning's next door neighbors, further complained of the dust problem. Roy Walker testified that the dust raised by the coal trucks was often so thick that "you couldn't even see my neighbor's house for the dust." Vergie Walker stated that, "[W]e couldn't run the fan of the day. It would blow the dust through the windows and on the table and things. You could write your names on the tables. Couldn't keep it clean." Both Mr. and Mrs. Walker also corroborated the testimony of the ap-

pellants' other witnesses to the effect that most of the dust was created by the operation of the coal trucks.

In contrast to the wealth of testimony presented by the appellants, as well as a number of photographs depicting the clouds of dust created by the appellees' trucking activities, only three witnesses testified on behalf of the appellees. Clell Cline, who also lived on the route in question, and who was employed as a mine guard by three mines which used the route, testified that the road had always been dusty and that the dust did not inhibit the growth of a patch of ginseng, an aromatic root, he had planted along the road. Doreen Lyons, a county nurse, who had been to the West home to dress a wound on Mila's leg, testified that, on that one occasion in the dead of winter, she could not recall seeing any dust in the West home. Finally, Artemus Adkins, general superintendent of National Mines, stated that the only reason the roadway had not been treated to minimize the dust problem was that, in the company's view, such treatment was illegal, although he could point to no authority on which this conclusion was based.

Without question, "It is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony is conflicting." Syl. pt. 3, *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832 (1975); *see also* Syl. pt. 5, *Illosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603 (1983); Syl. pt. 3, *W.L. Thaxton Const. Co. v. O.K. Const. Co.*, 170 W.Va. 657, 295 S.E.2d 822 (1982); Syl., *Morgan v. Bottome*, 170 W.Va. 23, 289 S.E.2d 469 (1982); Syl. pt. 1, *Elsey Ford Sales, Inc. v. Solomon*, 167 W.Va. 891, 280 S.E.2d 718 (1981); Syl. pt. 2, *West Virginia Department of Highways v. Delta Concrete Co.*, 165 W.Va. 398, 268 S.E.2d 124 (1980); Syl. pt. 2, *Rhodes v. National Homes Corp.*, 163 W.Va. 669, 263 S.E.2d 84 (1979); Syl. pt. 2, *Blamble v. Harsh*, 163 W.Va. 733, 260 S.E.2d 273 (1979); Syl. pt. 2, *Bourne v. Mooney*, 163 W.Va. 144, 254 S.E.2d 819 (1979); Syl. pt. 6, *Higginbotham v. City of Charleston*, 157 W.Va. 724, 204 S.E.2d 1 (1974), *overruled on other*

*grounds,* Syl. pt. 3, *O'Neil v. City of Parkersburg*, 160 W.Va. 694, 237 S.E.2d 504 (1977); Syl. pt. 3, *Hall v. Nello Teer Co.*, 157 W.Va. 582, 203 S.E.2d 145 (1974); Syl. pt. 4, *Young v. Ross*, 157 W.Va. 548, 202 S.E.2d 622 (1974); Syl. pt. 4, *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973); Syl. pt. 3, *Willey v. Travelers Indemn. Co.*, 156 W.Va. 398, 193 S.E.2d 555 (1972); Syl. pt. 1, *Yeager v. Stevenson*, 155 W.Va. 16, 180 S.E.2d 214 (1971); Syl. pt. 3, *Gilmer v. Sydenstricker*, 42 W.Va. 52, 24 S.E. 566 (1896). Furthermore, it is well established that:

> In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

Syl. pt. 1, *Butcher v. Stull*, 140 W.Va. 31, 82 S.E.2d 278 (1954); *see also* Syl. pt. 20, *Illosky v. Michelin Tire Corp., supra;* Syl. pt. 1, *Lipscomb v. King Knob Coal Co.*, 171 W.Va. 521, 300 S.E.2d 635 (1983); Syl. pt. 2, *Perry v. Melton*, 171 W.Va. 397, 299 S.E.2d 8 (1982); Syl. pt. 3, *Royal Furniture Co. v. City of Morgantown*, 164 W.Va. 400, 263 S.E.2d 878 (1980); Syl., *Bates v. Sirk*, 159 W.Va. 917, 230 S.E.2d 738 (1976); Syl. pt. 5, *First National Bank of Ronceverte v. Bell*, 158 W.Va. 827, 215 S.E.2d 642 (1975); Syl. pt. 4, *Long v. City of Weirton, supra;* Syl. pt. 2, *Cox v. Galigher Motor Sales Co.*, 158 W.Va. 685, 213 S.E.2d 475 (1975); Syl. pt. 17, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974); Syl. pt. 3, *Skeen v. C & G Corp.*, 155 W.Va. 547, 185 S.E.2d 493 (1971); Syl. pt. 2, *Yeager v. Stevenson*, 155 W.Va. 16, 180 S.E.2d 214 (1971); Syl. pt. 6, *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W.Va. 549, 165 S.E.2d 113 (1968); Syl. pt. 5, *Poe v. Pittman*, 150 W.Va. 179, 144 S.E.2d 671 (1965); Syl. pt. 6, *Nesbitt v. Flaccus*, 149 W.Va. 65, 138 S.E.2d 859 (1964); Syl. pt. 3, *Walker v. Monogahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963); Syl. pt. 1, *Rockingham Poultry Marketing Co-op, Inc. v. Baltimore & Ohio R. Co.*, 145

W.Va. 787, 117 S.E.2d 504 (1961); Syl. pt. 1, *Wiseman v. Ryan,* 116 W.Va. 525, 182 S.E. 670 (1936). In the final analysis, however, "A verdict of a jury without evidence to support it, or against the clear weight and preponderance of conflicting evidence, will be set aside by this Court." Syl., *Speicher v. State Farm Mutual Automobile Insurance Co.,* 151 W.Va. 292, 151 S.E.2d 684 (1966); *see also* Syl. pt. 1, *Koger v. Mutual of Omaha Ins. Co.,* 152 W.Va. 274, 163 S.E.2d 672 (1968); Syl. pt. 3, *Laxton v. National Grange Mut. Ins. Co.,* 150 W.Va. 598, 148 S.E.2d 725 (1966), *overruled on other grounds, Smith v. Municipal Mutual Ins. Co.,* 289 S.E.2d 669, 671 (W.Va. 1982); Syl. pt. 3, *Quality Bedding Co. v. American Credit Indemn. Co.,* 150 W.Va. 352, 145 S.E.2d 468 (1965); Syl. pt. 3, *Lester v. Flanagan,* 145 W.Va. 166, 113 S.E.2d 87 (1960); Syl. pt. 2, *Reece v. Hall,* 142 W.Va. 365, 95 S.E.2d 648 (1957); Syl. pt. 1, *Muldoon v. Kepner,* 141 W.Va. 577, 91 S.E.2d 727 (1956); Syl. pt. 5, *Sammons Bros. Const. Co. v. Elk Creek Coal Co.,* 135 W.Va. 656, 65 S.E.2d 94 (1949); Syl. pt. 3, *Burgess v. Gilchrist,* 123 W.Va. 727, 17 S.E.2d 804 (1942); Syl., *McKown v. Citizens' State Bank,* 91 W.Va. 716, 114 S.E. 271 (1922); Syl. pt. 1, *Dexter & Carpenter, Inc. v. Cooperative Fuel Co.,* 90 W.Va. 465, 111 S.E. 153 (1922); Syl. pt. 5, *Owen v. Appalachian Power Co.,* 78 W.Va. 596, 89 S.E. 262 (1916); Syl. pt. 4, *Fuccy v. Coal & Coke Ry. Co.,* 75 W.Va. 134, 83 S.E. 301 (1914); Syl., *Booth v. Camden Interstate Ry. Co.,* 68 W.Va. 674, 70 S.E. 559 (1911); Syl. pt. 2, *Priddy v. Black Betsey Coal & Mining Co.,* 64 W.Va. 242, 61 S.E. 163 (1908); Syl. pt. 2, *Casto v. Baker,* 59 W.Va. 683, 53 S.E. 600 (1906); Syl. pt. 1, *Chapman v. Liverpool Salt & Coal Co.,* 57 W.Va. 395, 50 S.E. 601 (1905); Syl. pt. 1, *Vintroux v. Simms,* 45 W.Va. 548, 31 S.E. 941 (1898).

In *Martin v. Williams,* 141 W.Va. 595, 610, 93 S.E.2d 835, 844 (1956), this Court described the concept of private nuisance as follows:

A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable. * * * A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property or his comfort. * * * A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby. * * * When the prosecution of a business, of itself lawful, in a strictly residential district, impairs the enjoyment of homes in the neighborhood, and infringes upon the well-being, comfort, repose, and enjoyment of the ordinary normal individual residing therein, the carrying on of such business in such locality becomes a nuisance, and may be enjoined. [Citations omitted].

*See also Sticklen v. Kittle,* 168 W.Va. 147, 287 S.E.2d 148, 160 n. 14 (1981); *West v. National Mines Corp.,* 168 W.Va. at 586–587, 285 S.E.2d at 676; *Mahoney v. Walter,* 157 W.Va. 882, 889, 205 S.E.2d 692, 697 (1974). Similarly, in *Pope v. Edward M. Rude Carrier Corp.,* 138 W.Va. 218, 225, 75 S.E.2d 584, 589 (1953), this Court stated that:

"In legal phraseology the term 'nuisance' is applied to that class of wrongs which arises from the unreasonable, unwarrantable, or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage." 39 Am. Jur., Nuisances, Section 2.

In addition to these considerations, several other features of causes of action for nuisance are particularly noteworthy. First, as recognized by this Court in *Flanagan v. Gregory & Poole, Inc.,* 136 W.Va. 554, 562, 67 S.E.2d 865, 871 (1952), there is a distinction between nuisance and negligence theories of recovery: "An act done with the best of care may result in a nuisance. ... The creation of a nuisance is the violation of an absolute duty. Negligence is the violation of a relative duty." [Citations omitted]. *See also Severt v. Beckley Coals, Inc.,* 153 W.Va. 600, 605, 170 S.E.2d 577, 581 (1969) (evidence sufficient to submit both negligence and nui-

sance theories of recovery to jury). Second, in Syllabus Point 7 of *Sanders v. Roselawn Memorial Gardens, Inc.*, 152 W.Va. 91, 159 S.E.2d 784 (1968), this Court held that:

> As a general rule, a fair test as to whether a business, which is not unlawful in itself, or whether a particular use of property in connection with which the business is maintained and operated constitutes a nuisance, is the reasonableness thereof in the particular locality and under all the existing circumstances; and ordinarily, where the business and the manner in which it is conducted are reasonable, no nuisance is thereby created against which a complaining party may have legal relief.

*See also* Syl. pt. 3, *Sticklen v. Kittle, supra;* Syl. pt. 2, *Mahoney v. Walter, supra.* Third, as was observed in *West v. National Mines Corp.,* 168 W.Va. at 589, 285 S.E.2d at 678, "[A]ll persons who join or participate in the creation or maintenance of a nuisance are liable jointly and severally for the wrong and injury done thereby. 58 Am. Jur. 2d, *Nuisances* § 56 (1971)." *See also* Syl. pt. 6, *Lemon v. Rumsey,* 108 W.Va. 242, 150 S.E. 725 (1929) ("A nuisance is not justified by the existence of a similar nuisance in the same locality."). Finally, in addition to the recovery of damages to *realty* caused by a temporary nuisance, described in Syllabus Point 3 of *Jones v. Pennsylvania R.R.,* 138 W.Va. 191, 75 S.E.2d 103 (1953), as, " 'The true elements in an action to recover temporary damages for injury to real estate are the cost of repairing the injury to the party, reimbursement for expenses directly occasioned by the injury, and compensation for loss of use or rent of the property.' *Oresta v. Romano Bros., [Inc.],* [137 W.Va. 633], 73 S.E.2d 622 [1953]," it has been noted that:

> The prevailing view is that recovery is not limited to damages to plaintiff's property and its rental value, but the owner of a residence or dwelling house occupied by him as a home is entitled to just compensation for annoyance, discomfort, and inconvenience caused by a nuisance ... even though he makes no showing of a monetary loss, or of bodily injury or illness.

> 58 Am.Jur.2d, *Nuisances,* § 123, at 692–93 (1971) (Footnotes omitted).

Unfortunately, the trial in the instant case was not conducted in conformance with these important considerations. Foremost was the trial court's mistaken view that "nuisance in this particular type case must be based on some negligence." Not only did this misconception result in the trial court's complete elimination of the operative standard of recovery, that of "reasonableness," from the instructions given the jury over the objections of counsel for the appellants, argument of counsel for the appellees to the jury emphatically reinforced this erroneous standard by repeatedly inquiring of the jury in a rhetorical fashion, "What is illegal about that? What is negligent about that?" in reference to the activities alleged to constitute nuisance. Similarly, counsel for the appellees was permitted by the trial court to refer to the potential liability of other individuals despite our recognition of the applicability of the doctrine of joint and several liability:

> Mr. Moler [appellants' counsel] says blame it all on National regardless, blame it all on National. ... You are going to have to blame all of the state agencies, DNR, Department of Natural Resources, Department of Mines, MSHA, the federal mine inspector, OSM, surface mine inspector. They all used the road. All the companies that hauled supplies to mines, they all used the road. * * * I have never seen a case where they walk in and say, "Look, I have been wronged, so I am going to sue you and you and you because I happen to know you; I am going to pick you out of everybody and I am going to sue you."

Furthermore, despite the applicable standards with respect to the measurement of damages, counsel for the appellees was permitted to argue to the jury:

> If you would decide that Grat West and his wife are due some money, how much? If you have an automobile accident and your car is damaged, you take it to the body shop and the man says, "I will fix it

for a hundred dollars," and he writes up an estimate, and then if you have to go to court you can say, "This is my damage, it is a hundred dollars." They haven't told us how much extra work they had to do, if any. So how are you going to put a dollar value on that? They haven't told us how much extra cleaning they had to do or how much extra material it costs for cleaning and all that. They haven't told us.

In addition to the divergence from accepted principles of nuisance, much of the argument of counsel portrayed the appellants as obsessed old people whose suit sought to destroy the local economy. Counsel for the appellees argued:

> You know how old folks are.... You see, they have nothing else to think about, and they get obsessed. They can have their social security ... sent to the bank ... and they don't have to go over here and get in line and wait half a day.... And Grat didn't have much to do. He has been disabled, hasn't worked since he was twenty-six, and he has nothing to do but sit on his porch, and I have an idea that he has ... made a lot more of it than it actually is.

Counsel for the appellees also continually stressed the economic plight of his clients, stating that, "National ... will shut down within the next couple of weeks—it might reopen in the spring and it might not...." Counsel further connected the outcome of this case to the prosperity of the coal industry, stating that:

> This is an important case. I doubt if any of us will ever be called on to decide something any more important than this, because if Grat West is awarded one dollar by this jury then everybody else that lives along the road anywhere has a license to bring a suit because there is dust where trucks pass. ... How long can the coal industry last? How long can a way of life continue? There is no way. No way. So we have to make this determination.

Finally, in concluding his argument to the jury, counsel for the appellees observed:

> I would say they have tried to trump up a pretty good case here for a whole lot of money. I don't think this jury is going to make a decision which will result in the destruction of the coal industry as it exists today in southern West Virginia. ... If there is no coal dust on the streets of Pineville, there is nobody in the stores. ... There is no money to pay income taxes with, there is no money to pay social security, there is no money to pay black lung, there is no money to pay Workmen's Compensation, there is no money to pay unemployment compensation, there is no money to pay truckers to get their trucks repaired, to buy fuel, there is no money to support the schools, there is no money to build roads, and that is the truth and you know it, and I am glad to leave this case in your hands. Thank you.

Examination of the record in this case unequivocally reveals that the verdict of the jury was plainly against the overwhelming weight and preponderance of the evidence. Ample testimony was presented by the appellants clearly demonstrating that as a direct and proximate result of the operation of large coal trucks employed by the appellees traveling in tandem at excessive speeds on an untreated dirt road less than sixty feet from the appellants' doorstep huge clouds of dust were raised which followed the prevailing winds to be deposited on the appellants' home, interfering with the use and enjoyment of their house and causing considerable inconvenience, annoyance, and discomfort. Furthermore, photographic evidence was submitted which clearly corroborated this testimony. On the other hand, the only testimony the appellees were able to muster consisted of a nurse who had been to the appellants' home on one occasion in the dead of winter who could not remember the existence of dust; a night watchman for three of the mines which used the route in question who testified that the dust did not harm his planting of ginseng; and, the superintendent of National Mines Corporation who testified that the road was not treated because the company believes that such treatment

might be illegal, although no action was taken to confirm this belief.

Although economic prosperity is unquestionably a legitimate concern of any community, the legal rights of its members cannot be sacrificed, accompanied by solemn incantations of improving the business climate, at the altar of mammon. Accordingly, I would reverse the judgment order, set aside the jury verdict, and award the appellants a new trial.